FILED

2007 Apr-13  PM 02:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

WILLIE C. DOBYNE,    )
          )
    **Petitioner,**   )
          )
**vs.**          )  **Civil Action No. CV 01-S-1550-S**
          )
**CHARLIE JONES, WARDEN,** )
          )
    **Respondent.**  )

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner's state court conviction and death sentence on a charge of capital murder.  *See* 28 U.S.C. § 2254. The Bibb County, Alabama grand jury returned an indictment on June 17, 1991, charging petitioner, Willie C. Dobyne, with two counts of capital murder.  The case against Dobyne, however, went to trial upon only the first count, reading as follows:

> The Grand Jury of said County charge that before the finding of this indictment WILLIE C. DOBYNE[,] whose name is otherwise unknown to the Grand Jury other than as stated, did intentionally cause the death of another person, to-wit:  Linda Snipes and Leon Billingsley by shooting them with a shotgun, and Willie C. Dobyne caused said death during the time that he was in the course of committing a theft of United States Currency, the Property of Country Truck Stop, by the use of force against the persons of Linda Snipes and Leon Billingsley, with intent to overcome their physical resistance or physical power of resistance, while the said Willie C. Dobyne was armed with a deadly weapon or dangerous instrument, to-wit: a shotgun, in violation of

1

13A-5-40(a)(2) of the Code of Alabama, against the peace and dignity of the State of Alabama.[1]

Dobyne was convicted of that charge on May 6, 1992, and the jury, by a vote of 10 to 2, recommended that he be sentenced to death.  The following summary of the evidence relevant to the offense of conviction is taken from the opinion of the Alabama Court of Criminal Appeals on direct appeal.  *See Dobyne v. State*, 672 So. 2d 1319 (Ala. Crim. App. 1994).

> The state's evidence tended to show that on January 12, 1991, at approximately 2:30 a.m., Leon Billingsley and Linda Snipes, employees of the County Truck Stop and Sawmill Restaurant (hereinafter called the County Truck Stop) in Brent, Alabama, were shot by the appellant [***the habeas petitioner in the present action***, **Willie C. Dobyne**] and his codefendant, Cleophus Dukes.  Evidence showed that the appellant shot Billingsley in the back and that Dukes shot Snipes in the upper chest and neck.  Kenneth E. Warner, State Medical Examiner, testified that both victims died as a result of the injuries.
>
> After the shootings the appellant and Dukes took Snipes's purse and the cash register and went to Bear Creek.  They then forced open the register, which contained approximately $200.00 in cash, and threw the empty register in the water.  Dukes later disposed of the guns by throwing them in Haysop Creek.

---

[1] R. 868.  To minimize confusion when reviewing the parties' briefs and accompanying evidentiary submissions, this court adopts Dobyne's method of referencing documents and transcript excerpts.  "R. ##" refers to the record on direct appeal.  "S. ##" refers to the first supplemental record on appeal, filed on September 22, 1992, and later amended to include previously-sealed motions.  "SS. ##" refers to the second supplemental record on direct appeal, filed on November 17, 1992.  "SSS. ##" refers to the third supplemental record on direct appeal, filed on March 1, 1993.  "SSSS. ##" refers to the fourth supplemental record on direct appeal, filed on April 22, 1994.  And, finally, "C. ##" refers to the record compiled during post-conviction, collateral review proceedings.

Because there were no eyewitnesses to the events, the above information was elicited from a tape-recorded conversation between the appellant and his half-brother, Joshua Suttle, and from a statement that the appellant gave to police. Other evidence was presented that connected the appellant to the crime and the shotguns were retrieved from Haysop Creek.

Anthony Parks testified that earlier on the night the shootings occurred, he was with the appellant and Dukes at a trailer belonging to Dukes's brother. He said that both Dobyne and Dukes were in the trailer when he went to bed. Parks stated that when he went to bed there were two shotguns in his bedroom, and that when he awoke the next morning the shotguns were gone and so were the appellant and Dukes. Parks identified one of the guns discovered in Haysop Creek as the gun that belonged to his father and that was in the bedroom when he went to bed. The other gun discovered in the creek, Parks testified, was like the other gun in the trailer the night before the shootings.

Bob Rinehart, chief of police of Brent, testified that he was at the County Truck Stop at approximately 11:00 p.m. on the night the murders occurred. He testified that at that time the appellant and Dukes were at the County Truck Stop. He further stated that he purchased two drinks and that Snipes put the money he paid her for the drinks in the cash register.

The manager of the County Truck Stop, Earnie Wilson, testified that when he left at around 10:00 p.m. on the night of the murders, both Billingsley and Snipes were in the store and there was approximately $200 in the cash register.

*Dobyne v. State*, 672 So. 2d 1319, 1324 (Ala. Crim. App. 1994) (bracketed alteration

and emphasis added).

Following trial, a formal sentencing hearing as required by Alabama Code §

13A-5-47 (1975) was conducted on June 24, 1992; and, in accordance with the jury's

3

recommendation, the trial court judge sentenced Dobyne to death.

Dobyne appealed his conviction and sentence to the Alabama Court of Criminal Appeals.   That Court entered a published opinion rejecting most of Dobyne's claims on April 15, 1994, *see Dobyne v. State*, 672 So. 2d 1319 (Ala. Crim. App. 1994), but also remanding the case to the trial court with instructions to correct the sentencing order, because of the trial judge's failure to state whether he had, when formulating the sentence, "considered *all* evidence presented for purposes of non-statutory mitigating circumstances."   *Id*. at 1352 (emphasis in original).[2]   In an

---

[2] Dobyne had argued on appeal that the trial court's sentencing order was "flawed," because the trial judge

> failed to state that the court considered *all* evidence presented for purposes of nonstatutory mitigating circumstances.  We must agree.
>
> > "'It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer; in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.'"
>
> *McWilliams* [*v. State*], 640 So.2d [982,] 988 [(Ala. Crim. App. 1991)], quoting, *Haney v. State*, 603 So. 2d 368 (Ala. Cr. App. 1991), *aff'd* 603 So. 2d 412 (Ala. 1992), *cert. denied*, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993). (Citations omitted.)  (Emphasis added.)
>
> Because the trial court's order fails to state that it considered *all* evidence that presented nonstatutory mitigation we remand this case to the Circuit Court for Bibb County.  *Ex parte Cochran*, 500 So. 2d 1179 (Ala. 1985).  The court's order clearly shows that it considered all statutory mitigating evidence, however, it lists only certain nonstatutory circumstances it considered in mitigation.  This cause is remanded so that the court can, if it has not previously, consider all other evidence

4

extended opinion on return from remand, the intermediate state appellate court entered an opinion affirming Dobyne's conviction and death sentence. *See Dobyne v. State*, 672 So. 2d 1353 (Ala. Crim. App. 1994).

The Supreme Court of Alabama affirmed the conviction and sentence on August 4, 1995, finding no reversible error, plain or otherwise. *See Ex parte Dobyne*, 672 So. 2d 1354 (Ala. 1995).

The United States Supreme Court denied Dobyne's petition for writ of *certiorari* on April 29, 1996. *See Dobyne v. Alabama*, 517 U.S. 1169 (1996).

Dobyne then filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on April 15, 1997. The petition was denied by the trial court on September 4, 1998, and the Alabama Court of Criminal Appeals affirmed the denial of relief on June 30, 2000. *See Dobyne v. State*, 805 So. 2d 733 (Ala. Crim. App. 2000). The Supreme Court of Alabama affirmed on June 15, 2001. *See Ex parte Dobyne*, 805 So. 2d 763 (Ala. 2001).

Shortly thereafter, on June 20, 2001, Dobyne filed his first habeas petition in this court.

---

offered towards nonstatutory mitigation and amend its order to reflect that it has "considered *all* evidence offered in mitigation." Due return should be filed in this court no later than 70 days from the date of this opinion.

*Dobyne v. State*, 672 So. 2d 1319, 1352 (Ala. Crim. App. 1994) (emphasis in original).

# I.  THE CLAIMS

Dobyne's "Final Amended Petition for Writ of Habeas Corpus"[3] alleges seventeen substantive claims and sixteen ineffective assistance of counsel contentions, which this court summarizes as follows:

A.    Petitioner is mentally retarded, and his execution will violate the Eighth Amendment's Cruel and Unusual Punishment Clause, as made applicable to the states through the Fourteenth Amendment's Due Process Clause.[4]

B.    Petitioner was denied due process of law, a fair trial, and a reliable determination of punishment by an impartial jury because deliberations were contaminated by extraneous influences injected by the jury foreperson.[5]

C.    Petitioner was denied a jury drawn from a fair cross-section of the community by the state court's systematic and intentional exclusion of disabled persons from the venire.[6]

D.    Petitioner was denied funds for examination by a neurologist.[7]

---

[3] Doc. no. 41.  Over the course of proceedings in this court, Dobyne has alleged a bewildering number of claims in four petitions:  *i.e.*, his original "Petition for Writ of Habeas Corpus by a Person in State Custody" drafted by attorney Christopher M. Johnson (doc. no. 1); an "Amended Petition for Writ of Habeas Corpus by a Person in State Custody" authored by the same attorney (doc. no. 5); a "Revised Amended Petition for Writ of Habeas Corpus" drafted by attorney Sanjay K. Chhablani (doc. no. 34); and the "Final Amended Petition for Writ of Habeas Corpus" authored by the same attorney (doc. no. 41).  Both attorneys listed the same office address:  83 Poplar Street N.W., Atlanta, Ga. 30303.

[4] *See* doc. no. 41 (Final Amended Petition) ¶¶ 27-43, at 8-19 (Claim "I").

[5] *Id*. ¶¶ 44-47, at 19-21 (Claim "II").

[6] *Id.* ¶¶ 48-50, at 21-22 (Claim "III").

[7] *Id*. ¶¶ 51-54, at 22-23 (Claim "IV").

E.    Two separate offenses — the robbery-murder of Mr. Billingsley and the robbery-murder of Ms. Snipes — were improperly charged in the same count of the indictment.[8]

F.    The trial court erred in failing to instruct the jury on the lesser included offense of felony murder.[9]

G.    Even though petitioner was expressly assured by the state's forensic psychologist who examined him for competency to stand trial "nothing that you tell me about the crimes can be used against you at trial unless you and your attorney decide to raise an insanity defense or some similar defense," and even though the written report of examination was not introduced into evidence, the trial judge improperly relied upon it as substantive evidence discount mitigating evidence offered by petitioner.[10]

H.    Petitioner was denied equal protection of the law by the trial judge's failure to take into account as a non-statutory mitigating circumstance the lesser sentence imposed upon the co-defendant.[11]

I.    The trial judge failed to take into account numerous, non-statutory, mitigating circumstances when determining sentence: *e.g.*, (1) petitioner voluntarily surrendered himself to investigators; (2) petitioner voluntarily confessed his involvement in the crime; (3) the crime might not have been solved, nor the identity of the co-defendant determined, if petitioner had not done the foregoing things; (4) petitioner was easily influenced by others and, in fact, was induced to participate in this crime by the co-defendant, who was the principal architect of, and actor in, the offense; (5) petitioner grew-up in an environment of abuse and neglect by an alcoholic mother (who permanently abandoned him when he was eight years of age) and a father who showed little interest in him; (6) petitioner showed signs of fetal alcohol syndrome, organic

---

[8] *See* doc. no. 41 (Final Amended Petition) ¶¶ 55-57, 62-63, at 24-25 and 27 (Claim "V").

[9] *Id.* ¶¶ 58-61, at 25-27 (Claim "V").

[10] *Id.* ¶¶ 64-69, at 27-30 (Claim "VI").

[11] *Id.* ¶¶ 70-74, at 30-32 (Claim "VII").

brain damage, and, suffered severe head injuries as a child; and (7) despite all of the foregoing circumstances, petitioner was a well-behaved, cooperative, and non-violent teenager.[12]

J.    Petitioner was deprived of a fair trial by an impartial jury by the prosecutor's racially discriminatory use of peremptory challenges.[13]

K.    Petitioner was deprived of a fair and impartial jury by the trial court's failure to excuse for cause certain jurors who expressed fixed opinions as to his guilt, or who were biased in favor of the prosecution due to relationships with either the victims or the prosecutors.[14]

L.    Petitioner was denied a jury drawn from a fair cross-section of the community by the state circuit court Clerk's act of excusing or deferring twenty-six prospective jurors outside the presence, and without the consent of, petitioner or his defense counsel.[15]

M.    The trial court committed error of constitutional magnitude when failing to conduct a hearing to fairly ascertain whether petitioner possessed the cognitive ability to — and, when ruling that petitioner had — knowingly, intelligently, and voluntarily waived his *Miranda* rights.[16]

N.    The prosecutor improperly commented upon petitioner's failure to testify during closing argument at the guilt phase of trial.[17]

O.    The prosecutor improperly argued during the sentencing phase of trial that "the law guarantees the death penalty," and that the victims were demanding a death

---

[12] *See* doc. no. 41 (Final Amended Petition) ¶¶ 75-81, at 32-35 (Claim "VIII").

[13] *Id.* ¶¶ 183-87, at 66-67 (Claim "X").

[14] *Id.* ¶¶ 188-93, at 67-68 (Claim "XI").

[15] *Id.* ¶¶ 194-96, at 68-69 (Claim "XII").

[16] *Id.* ¶¶ 197-205, at 69-72 (Claim "XIII").

[17] *Id.* ¶¶ 206-09, at 72-74 (Claim "XIV").

sentence from their graves.[18]

P.    The trial judge improperly instructed the jury at the conclusion of the sentencing phase of trial that they possessed the discretion to consider or not consider evidence of non-statutory mitigating circumstances.[19]

Q.    Alabama's capital sentencing scheme is unconstitutional, because it "is identical in all material respect to the Arizona statute held unconstitutional in *Ring v. Arizona*."[20]

R.    In addition to the foregoing, substantive claims, petitioner alleges that he was denied constitutionally effective assistance of trial counsel[21] in the following respects:

    (1)    counsel's failure to investigate and present compelling mitigating evidence during the sentencing phase of trial, including evidence that petitioner's infancy and childhood were marked by extreme poverty, neglect, abandonment, alcohol abuse, and violence;[22]

    (2)    counsel's failure to investigate and present during the sentencing phase of trial evidence supporting the statutory mitigating circumstance that petitioner acted "under the substantial domination of another person";[23]

    (3)    counsel's failure to challenge the prosecution's improper use, during the sentencing phase of trial, of the report of petitioner's competence to stand trial prepared by forensic psychologists employed at the state's

---

[18] *See* doc. no. 41 (Final Amended Petition) ¶¶ 210-13, at 74-75 ("Claim "XV").

[19] *Id.* ¶¶ 214-216, at 75-76 (Claim "XVI").

[20] *Id.* ¶¶ 217-223, at 76-81 (Claim "XVII").

[21] *Id.* ¶ 82, at 35 (Claim "IX").

[22] *Id.* ¶¶ 83-103, at 35-43 (Claim "IX(1)").

[23] *Id.* ¶¶ 104-09, at 43-45 (Claim "IX(2)").

Taylor Hardin Secure Medical Facility;[24]

(4)     counsel's failure to object to the trial court's improper guilt phase instructions concerning the robbery-murder of Mr. Billingsley and the robbery-murder of Ms. Snipes;[25]

(5)     counsel's failure to object to the lack of guilt phase instructions on lesser included offenses;[26]

(6)     counsel's failure to object to the lack of guilt phase instructions on the voluntariness of petitioner's statements;[27]

(7)     counsel's failure to either submit, or object to the trial judge's failure to give, a guilt phase instruction on the determination of witness credibility;[28]

(8)     counsel's failure to present evidence supporting the improper exclusion of disabled persons from the venire;[29]

(9)     counsel's failure to present evidence showing that African Americans had been systematically excluded from serving as grand jury forepersons in Bibb County, Alabama;[30]

(10)   counsel's failure to investigate and present evidence showing that

---

[24] *See* doc. no. 41 (Final Amended Petition) ¶¶ 110-15, at 45-47 (Claim "IX(3)").

[25] *Id*. ¶¶ 116-22, at 47-49 (Claim "IX(4)").

[26] *Id*. ¶¶ 123-31, at 49-50 (Claim "IX(5)").

[27] *Id*. ¶¶ 128-31, at 50 (Claim "IX(6)").

[28] *Id*. ¶¶ 132-34, at 50-51 (Claim "IX(7)").

[29] *Id*. ¶¶ 135-40, at 51-52 (Claim "IX(8)").

[30] *Id*. ¶¶ 141-45, at 52-53 (Claim "IX(9)").

petitioner was not competent to stand trial;[31]

(11)    counsel's failure to challenge the "unlawful" indictment (*i.e.*, two offenses charged in the same count);[32]

(12)    counsel's failure to challenge the indictment's defective allegation of the offense of robbery;[33]

(13)    counsel's failure to present evidence in support of petitioner's motion for funds to retain a neurologist;[34]

(14)    counsel's failure to investigate and present evidence supporting petitioner's motion for change of venue;[35]

(15)    counsel's failure to present evidence supporting the motion to suppress petitioner's statements;[36] and,

(16)    counsel's improper waiver of petitioner's right to be present at the hearing on his motion to quash the venire.[37]

Dobyne moved for an evidentiary hearing on six of the foregoing claims,[38] but

---

[31] *See* doc. no. 41 (Final Amended Petition) ¶¶ 146-55, at 54-57 (Claim "IX(10)").

[32] *Id*. ¶¶ 156-59, at 57-58 (Claim "IX(11)").

[33] *Id*. ¶¶ 160-61, at 58 (Claim "IX(12)").

[34] *Id*. ¶¶ 162-66, at 58-60 (Claim "IX(13)").

[35] *Id*. ¶¶ 167-69, at 60-61 (Claim "IX(14)").

[36] *Id*. ¶¶ 70-80, at 61-65 (Claim "IX(15)").

[37] *Id*. ¶¶ 181-82, at 65 (Claim "IX(16)").

[38] *See* doc. no. 53 (*Motion for an Evidentiary Hearing and Response to the State's Objection to an Evidentiary Hearing*).  The six claims on which Dobyne requested an evidentiary hearing are: Claim "I" in his final amended petition (Claim "A" above), pertaining to Dobyne's alleged mental retardation; Claim "II" in Dobyne's final amended petition (Claim "B" above), pertaining to alleged

the magistrate judge who sat on this case file far too long provisionally denied the motion, saying that, "[i]f the court deems it necessary an evidentiary hearing will be set after reviewing the pleadings."[39]

## II.  DISCUSSION

Respondent answered Dobyne's claims by asserting various lines of defenses, including the contention that many of his claims are procedurally defaulted, and opposed Dobyne's motion for an evidentiary hearing.[40]   This court concludes, however, that an evidentiary hearing is required on the two claims discussed below.

## A.    Mental Retardation

The first claim in Dobyne's final amended petition alleges that he is mentally

---

juror misconduct and extrinsic evidence during sentencing deliberations; Claim "IX(8)" in the final amended petition (Claim "R(8)" above), pertaining to the failure of trial counsel to present evidence supporting the exclusion of disabled person from the venire; Claim "IX(10)"in the final amended petition (Claim "R(10)" above), pertaining to the failure of trial counsel to present evidence that petitioner was not competent to stand trial; Claim "IX(14)" in the final amended petition (Claim "R(14)" above), pertaining to trial counsel's failure to present evidence supporting petitioner's motion to change venue; and Claim "IX(15)" in Dobyne's final amended petition (Claim"R(15)" above), pertaining to trial counsel's failure to present evidence supporting the motion to suppress petitioner's statements.

[39] *See* doc. no. 57 (Order electronically "stamped" on the face of the motion for evidentiary hearing (doc. no. 53) on Mar. 12, 2004).

[40] *See* doc. nos. 20 (*Respondent's Brief on the Merits*), 48 (*Answer to Dobyne's Final Amended Petition for Writ of Habeas Corpus*), 49 (*Respondent's Objection to an Evidentiary Hearing*), and 50 (*Respondent's Supplemental Brief Addressing the Inapplicability of the Ring and Atkins Decisions*).  Due to amendments to the petition and the motion for evidentiary hearing filed by Dobyne, these documents are not chronologically or numerically sequential, but are nonetheless sound when considered in the context of the natural course of pleadings, responses and precedential Supreme Court decisions made while the case has been pending.

retarded, and that his execution accordingly will constitute cruel and unusual punishment in violation of the Eighth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment.[41] *See Atkins v. Virginia*, 536 U.S. 304 (2002).[42]

Respondent contends this claim was procedurally defaulted under Alabama Rule of Criminal Procedure 32.2(a), because it could have been, but was not, raised at trial, on direct appeal, or during collateral review proceedings in the state courts.[43]

---

[41] *See* doc. no. 41 (*Final Amended Petition for Writ of Habeas Corpus*) ¶¶ 27-43, at 8-19; doc. no. 53 (*Motion for an Evidentiary Hearing and Response to the State's Objection to an Evidentiary Hearing*), at 3-6; and doc. no. 54 (*Petitioner's Supplemental Brief in Support of Final Amended Petition for Writ of Habeas Corpus*), at 5.

[42] The Cruel and Unusual Punishment Clause of the Eighth Amendment was first applied to the states through the Due Process Clause of the Fourteenth Amendment by the Supreme Court's decision in *Robinson v. California*, 370 U.S. 660, 667 (1962). *See also Furman v. Georgia*, 408 U.S. 238 (1972).

[43] *See, e.g.*, doc. no. 48 (*Answer to Dobyne's Final Amended Petition for Writ of Habeas Corpus*). Alabama Rule of Criminal Procedure 32.2(a) read as follows prior to its amendment in 2002:

> **(a) Preclusion of grounds.** A petitioner will not be given relief under this rule based upon any ground:
>
> (1) Which may still be raised on direct appeal under the Alabama Rules of Appellate Procedure or by post-trial motion under Rule 24; or
>
> (2) Which was raised or addressed at trial; or
>
> (3) *Which could have been but was not raised at trial*, unless the ground for relief arises under Rule 32.1(b); or
>
> (4) Which was raised or addressed on appeal or in any previous collateral proceeding; or

When making this argument, respondent also asserts that the Supreme Court's decision in *Atkins v. Virginia*, *supra*, did not announce a new, substantive rule of constitutional law, previously unavailable, and retroactive to cases on collateral review;[44] and, for that reason, respondent contends that Dobyne would be barred from raising the claim in a successive Rule 32 petition.[45]  Both arguments lack merit.

1.   **First Issue**: *Is this claim procedurally defaulted because Dobyne failed to raise it at trial, on direct appeal, or at any time during collateral review proceedings in the state court system?*

During the entire time that Dobyne's claims were pending within the state court system — indeed, up to June 20, 2002, the date on which the *Atkins* decision was announced, *and*, one year to the day *after* Dobyne filed his first habeas petition in this court — the Supreme Court's opinion in *Penry v. Lynaugh*, 492 U.S. 302 (1989), provided the rule of decision governing the effect to be given evidence of mental retardation in capital proceedings.  *Penry* held that the execution of mentally retarded

---

(5) *Which could have been but was not raised on appeal*, unless the ground for relief arises under Rule 32.1(b).

Ala. R. Crim. P. 32.2(a) (2000) (emphasis added to portions relied upon by respondent).

[44] *See* doc. no. 50 (*Respondent's Supplemental Brief Addressing the Inapplicability of the Ring and Atkins Decisions*).

[45] *See*, *e.g.*, doc. no. 48 (*Answer to Dobyne's Final Amended Petition for Writ of Habeas Corpus*) and doc. no. 50 (*Respondent's Supplemental Brief Addressing the Inapplicability of the Ring and Atkins Decisions*), at 5.

individuals did not *categorically* violate the Eighth Amendment's prohibition against cruel and unusual punishments, *provided* jurors had been instructed that they could consider, and give mitigating effect to, evidence of a defendant's mental retardation. *See id*. at 328 (O'Connor, J., majority opinion).[46]  The *Penry* judgment was based, at least in part, on Justice O'Connor's observation that there *then was* "insufficient evidence" of "a national consensus against execution of the mentally retarded." *Id*. at 340 (O'Connor, J., Part IV-C of opinion).[47]

During the thirteen years following the *Penry* decision, however, just such a consensus evolved.  Eighteen states enacted legislation expressly providing that a sentence of death could not be carried out upon mentally retarded persons.  *See Atkins v. Virginia*, 536 U.S. 304, 313-17 (2002).  That number did not count the statutory prohibitions on the execution of mentally retarded persons that had been enacted by Georgia, Maryland, and the United States Congress prior to the *Penry* decision, nor the fourteen states that had rejected capital punishment under any circumstances.  *Id*.

---

[46] Justices Brennan, Marshall, Blackmun, and Stevens joined Justice O'Connor in this part ("III") of the opinion in *Penry*.

[47] Justice O'Connor spoke only for herself in this part ("IV-C") of the *Penry* opinion. Justices Brennan, Marshall, Stevens and Blackmun would have concluded that execution of mentally retarded persons violated the Eighth Amendment.  *See* 492 U.S. at 343–50.  At the time Justice O'Connor wrote, only Congress and two states (Georgia and Maryland) had enacted legislation proscribing the execution of mentally retarded defendants.  *See Atkins v. Virginia*, 536 U.S. 304, 313-15 (1988).

15

at 313-16.  The weight of that evolving national consensus,[48] together with "the

consistency of the direction of change,"[49] persuaded the Court to abrogate its opinion

in *Penry*, and to hold that execution of mentally retarded persons categorically

violated the Eighth Amendment.  In the Court's words:

> Our independent evaluation of the issue reveals no reason to
> disagree with the judgment of the legislatures that have recently
> addressed the matter and concluded that death is not a suitable
> punishment for a mentally retarded criminal.  We are not persuaded that
> the execution of mentally retarded criminals will measurably advance
> the deterrent or the retributive purpose of the death penalty.  Construing
> and applying the Eighth Amendment in the light of our evolving
> standards of decency, we therefore conclude that such punishment is
> excessive and that the Constitution places a substantive restriction on
> the State's power to take the life of a mentally retarded offender.

*Atkins v. Virginia*, 536 U.S. at 321 (citation and internal quotation marks omitted).

Consequently, Dobyne hardly can be faulted for failing to assert in the state

---

[48] *Id*. at 307 ("[I]n the 13 years since we decided *Penry v. Lynaugh*, the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal.  The consensus reflected in those deliberations informs our answer to the question presented by this case:  whether such executions are 'cruel and unusual punishments' prohibited by the Eighth Amendment to the Federal Constitution.") (citation omitted).

[49] *Id*. at 315-16 ("It is not so much the number of these States that is significant, but the consistency of the direction of change.  Given the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal.  The evidence carries even greater force when it is noted that the legislatures that have addressed the issue have voted overwhelmingly in favor of the prohibition.") (footnotes omitted).

courts a claim for which no constitutional basis existed until one year *after* the date on which he filed his first habeas petition in this court.

Moreover, and despite respondent's arguments to the contrary,[50] it is patently clear that the *Atkins* decision announced "a new substantive rule of constitutional law, made retroactive to cases on collateral review." *In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003); *see also Penry v. Lynaugh*, 492 U.S. at 330 (stating that, "if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity [discussed in *Teague v. Lane*, 489 U.S. 288, 301 (1989),] and would be applicable to defendants on collateral review") (O'Connor, J., unanimous opinion); *In re Hill*, 437 F.3d 1080, 1082 (11th Cir. 2006) (holding that the new rule of constitutional law announced in *Atkins* "meets the requirement of 28 U.S.C. § 2244(b)(2)(A)" and, therefore, is retroactive to cases on collateral review); *In re Hicks*, 375 F.3d 1237, 1239 (11th Cir. 2004) (same).

In sum, it cannot be said that a habeas petitioner's claim that he is mentally retarded, and that his execution consequently will constitute cruel and unusual

---

[50] *See* doc. no. 50 (*Respondent's Supplemental Brief Addressing the Inapplicability of the Ring and Atkins Decisions*).

punishment, was "defaulted" under state procedural rules simply because that claim was not explicitly asserted in the state trial and appellate courts prior to the Supreme Court's opinion in *Atkins*.  Even Alabama's appellate courts agree on this point.  *See*, *e.g.*, *Morrow v. State*, 928 So. 2d 315, 323, 324 (Ala. Crim. App. 2004) (suggesting procedures for addressing an *Atkins* claim "*regardless of when the issue is raised*") (emphasis supplied).  *See also Tarver v. State*, 940 So. 2d 312, 317 (Ala. Crim. App. 2004) (retroactively applying *Atkins* rule to a claim not presented in the defendant's Rule 32 petition); *Clemons v. State*, No. CR-01-1355, 2003 WL 22047260 (Ala. Crim. App. Aug. 29, 2003) (concluding that *Atkins* applied retroactively to a claim that had been raised for the first time on appeal from the denial of a Rule 32 petition).

**2**.    **Second Issue**:   *Is Dobyne's Eighth Amendment claim procedurally defaulted because he did not raise it in a second Rule 32 petition in state court?*

Dobyne concedes that he has never attempted to raise his mental retardation claim in state court.[51]  He justifies this failure by arguing that Alabama Rule of Criminal Procedure 32.2(c), which specifies the statute of limitations governing petitions for post-conviction relief, only allows such petitions to be filed outside the applicable statute of limitations on the basis of newly discovered material facts; and,

---

[51] *See* doc. no. 54 *(Petitioner's Supplemental Brief in Support of Final Amended Petition for Writ of Habeas Corpus)*, at 8.

since "some facts about Mr. Dobyne's mental retardation were known to defense counsel at the time of trial," the out-of-time exception set forth in Rule 32.2(c) does not provide him a means of relief.[52]

The question before this court, therefore, is whether Alabama's rules provide any procedural avenue through which Dobyne, prior to raising this claim for the first time in his habeas petition, could have presented the claim to the state courts?  If so, this court then must decide whether the state's procedural rules provide "adequate"

─────────────────

[52] Doc. no. 54 (*Petitioner's Supplemental Brief in Support of Final Amended Petition for Writ of Habeas Corpus*), at 45 n.38.  Alabama Rule of Criminal Procedure 32.2(c) presently reads as follows:

> **(c) Limitations Period**.  Subject to the further provisions hereinafter set out in this section, the court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed:  (1) In the case of a conviction appealed to the Court of Criminal Appeals, within one (1) year after the issuance of the certificate of judgment by the Court of Criminal Appeals under Rule 41, Ala.R.App.P.; or (2) in the case of a conviction not appealed to the Court of Criminal Appeals, within one (1) year after the time for filing an appeal lapses; provided, however, that the time for filing a petition under Rule 32.1(f) to seek an out-of-time appeal from the dismissal or denial of a petition previously filed under any provision of Rule 32.1 shall be six (6) months from the date the petitioner discovers the dismissal or denial, irrespective of the one-year deadlines specified in the preceding subparts (1) and (2) of this sentence; and provided further that the immediately preceding proviso shall not extend either of those one-year deadlines as they may apply to the previously filed petition.  The court shall not entertain a petition based on the grounds specified in Rule 32.1(e) unless the petition is filed within the applicable one-year period specified in the first sentence of this section, or within six (6) months after the discovery of the newly discovered material facts, whichever is later; provided, however, that the one-year period during which a petition may be brought shall in no case be deemed to have begun to run before the effective date of the precursor of this rule, *i.e.*, April 1, 1987.

and "independent" grounds for federal procedural default purposes.[53]  If that question

should be answered in the affirmative — *i.e.*, it is determined that the state procedural

rules should be honored for federal procedural default purposes in the particular

factual context of this case — then this court must next determine whether Dobyne

has demonstrated either "cause and prejudice" or "manifest injustice" to excuse the

procedural default.[54]

Discussion of these questions must begin with the essence and application of

the so-called "exhaustion doctrine" because, in the jargon peculiar to habeas

---

[53] The "procedural default doctrine" bars habeas review of state court rejections of a state prisoner's federal constitutional claims when three circumstances converge:  *i.e.*, (*i*) the last state court to review the claim (*ii*) states clearly and expressly that its disposition of the claim rests on a state-law bar, and (*iii*) the state-law ground "is *independent* of the federal question and *adequate* to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (emphasis supplied); *see also*, *e.g.*, *Harris v. Reed*, 489 U.S. 255, 262-63 (1989); *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  A state-law bar is "independent of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law."  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  A state-law bar is deemed to be "adequate to support the judgment" when it is "firmly established and regularly followed," *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005), and, it is not "applied in an arbitrary or unprecedented fashion" that is "'manifestly unfair' in its treatment of the petitioner's federal constitutional claim."  *Judd*, 250 F.3d at 1313 (quoting *Card*, 911 F.2d at 1517).

[54] There are only three circumstances in which a state-law ground will not bar a federal habeas court from considering a federal constitutional claim that was defaulted in state court:  (*i*) the habeas petitioner shows both cause for, and actual prejudice as a result of, failing to comply with the state-law ground; or (*ii*) the petitioner shows that the federal court's failure to consider his claim will result in a "fundamental miscarriage of justice"; or (*iii*), as discussed in the immediately preceding footnote in connection with the "adequacy" of a state bar, the petitioner demonstrates that the state-law ground was not "firmly established and regularly followed."  *See*, *e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring).

jurisprudence, Dobyne did not "exhaust" his Eighth Amendment claim before asserting it for the first time in this court.  Generally speaking, habeas relief on a federal constitutional claim is not available to a state prisoner who failed to "exhaust" all judicial remedies available in the state court system with regard to that claim.  As the Supreme Court stated in *Picard v. Connor*, 404 U.S. 270 (1971), the

> exhaustion-of-state-remedies doctrine, now codified in the federal habeas statute, 28 U.S.C. §§ 2254(b) and (c),[55] reflects a policy of

---

[55] The cited statutory provisions now read as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B) (i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. §§ 2254(b), (c) (2007).

federal-state comity, *Fay v. Noia*, 372 U.S. 391, 419-420 (1963); *Bowen v. Johnston*, 306 U.S. 19, 27 (1939), "an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Wilwording v. Swenson*, [404 U.S. 249,] 250 [(1971)].   We have consistently adhered to this federal policy, for "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." *Darr v. Burford*, 339 U.S. 200, 204 (1950) (overruled in other respects, *Fay v. Noia*, *supra*, 372 U.S., at 435-436). It follows, of course, that once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied. See, *e.g.*, *Wilwording v. Swenson*, *supra*, at 250; *Roberts v. LaVallee*, 389 U.S. 40, 42-43 (1967); *Brown v. Allen*, 344 U.S. 443, 447-450 (1953).

We emphasize that the federal claim must be fairly presented to the state courts.  If the exhaustion doctrine is to prevent "unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution," *Ex parte Royall*, [117 U.S. 241, 251 (1886)], it is not sufficient merely that the federal habeas applicant has been through the state courts.  The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts.  Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.  See *Darr v. Burford*, *supra*, at 203; *Davis v. Burke*, 179 U.S. 399, 401-403 (1900).

*Picard v. Connor*, 404 U.S. at 275-76.  *See also*, *e.g.*, *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (*per curiam*) (same); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (same).

Further, it usually is said that federal courts cannot consider habeas petitions

containing both exhausted and unexhausted claims, and a habeas petitioner who submits such a "mixed petition" generally must either return to the state courts to litigate the unexhausted claims, or amend his habeas petition to present only exhausted claims to the district court. *See*, *e.g.*, *Rose v. Lundy*, 455 U.S. 509, 510 (1982) (plurality opinion) ("Because a rule requiring exhaustion of all claims furthers the purposes underlying the habeas statutes, we hold that a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court."); *Hunter v. Evans*, 791 F.2d 1487, 1488 (11th Cir. 1986) (*per curiam*) (*pro se* petitioner permitted to delete unexhausted claims without presenting them to state court, and to proceed on exhausted claims).

For several reasons, however, this case presents an exception to those general propositions of habeas law.  First, as discussed above, the legal basis for Dobyne's Eighth Amendment claim did not exist until a year after he filed his first habeas petition in this court.

Second, it would be futile to now require Dobyne to return to state court to pursue his Eighth Amendment claim, because it is obvious that the claim would be barred by the interplay between Alabama Rules of Criminal Procedure 32.2(b) and (c).  Specifically, it arguably appears upon an initial reading of Alabama Rule of

Criminal Procedure 32.2(b) that, if Dobyne were required to return to state court for

the purpose of asserting his Eighth Amendment claim, that Rule would allow him an

avenue for doing so, because the legal basis for his claim did not exist when he last

was before the state courts.  Rule 32.2(b) provides:

> **(b) Successive Petitions**.  If a petitioner has previously filed a
> petition that challenges any judgment, all subsequent petitions by that
> petitioner challenging any judgment arising out of that same trial or
> guilty-plea proceeding shall be treated as successive petitions under this
> rule.  The court shall not grant relief on a successive petition on the
> same or similar grounds on behalf of the same petitioner.  *A successive
> petition on different grounds* shall be denied *unless* (1) the petitioner is
> entitled to relief on the ground that the court was without jurisdiction to
> render a judgment or to impose sentence or (2) *the petitioner shows both
> that good cause exists why the new ground or grounds were not known
> or could not have been ascertained through reasonable diligence when
> the first petition was heard*, and that failure to entertain the petition will
> result in a miscarriage of justice.

Ala. R. Crim. P. 32.2(b) (2006) (emphasis supplied).   However, the statute of

limitations that applied to claims asserted during collateral review proceedings on the

date Dobyne filed his Rule 32 petition in the state court system was two years from

the issuance of a certificate of judgment on direct appeal.  (The limitation period was

reduced to one year on August 1, 2002.)  Thus, Dobyne's successive petition would

be time barred by Rule 32.2(c).

Third, Dobyne's inability to file a successive petition in state court due to the

statute of limitations specified in Alabama Rule of Criminal Procedure 32.2(c) can

be viewed as the State's failure to provide a means for a petitioner to bring a claim of this nature *and* in its procedural posture.[56]  In the absence of a state corrective process, Dobyne had no available remedy to attempt to exhaust prior to asserting his claim in this court.  Therefore, he is entitled to proceed on the merits of his Eighth Amendment claim.

Fourth, under the wording of Alabama Rules of Criminal Procedure 32.2(b) and (c), Dobyne's claim would be considered "unexhausted," but "time barred." There is no basis for holding, however, that those state rules are "adequate," in view of the substantive, retroactive effect of the *Atkins* decision, and, the unique procedural posture in which Dobyne's Eighth Amendment claim would have presented itself in state court.  Accordingly, Dobyne again is entitled to proceed on the merits of his

---

[56]   The exhaustion-of-state-remedies doctrine presumes that there is some procedure to exhaust.  *See* 28 U.S.C. § 2254(b)(1)(A).  The literal construction of Alabama Rules of Criminal Procedure 32.2(b) and (c), however, shows that there is no available procedural avenue through which Dobyne could have asserted this claim subsequent to the Supreme Court's opinion in *Atkins*. Moreover, there is no case law informing this court how Alabama state courts would have applied those Rules, had they acknowledged the substantive, retroactive nature of *Atkins* in a successive petition, filed outside the time limit of Rule 32.2(c), but within the narrow chronological window between June 24, 2002, the date the *Atkins* opinion was published, and Jan. 24, 2003 (six months after the *Atkins* opinion), or perhaps even June 24, 2003 (one year after *Atkins*).

Because this court cannot determine with certainty that there ever was a remedy available in state court through which Dobyne could have exhausted his Eighth Amendment claim before raising it here, this court can (and does) construe the literal construction of Rules 32.2(b) and (c) as providing him *no remedy*.  Under this construction, Dobyne should be allowed to proceed in this court pursuant to 28 U.S.C. § 2254(b)(1)(B)(i), because there is an absence of an available State corrective process.

claim in this court.[57]

Finally, if this court were to rule that Dobyne's claim is barred from federal review based upon the procedural default under state court rules, such a ruling would necessarily include a tacit finding that a procedural default in the State of Alabama is adequate and independent of federal law, such that the claim is considered procedurally defaulted under federal principles as well.[58]  Even so, the petitioner still is entitled to proceed *if* he shows either "cause and prejudice" for ignoring the procedural default, or that a manifest injustice will occur if his claim is not heard.[59]  This court can think of few Supreme Court cases that have changed the constitutional landscape as substantially as the *Atkins* decision.  Given the retroactive effect that watershed ruling must be given, Dobyne's case provides a quintessential example of circumstances for which the "cause and prejudice" standard, together with the obvious potential for manifest injustice, demand that the default under state procedural rules be ignored.[60]

---

[57] "'[T]he adequacy of state procedural bars to the assertion of federal questions' . . . is not within the State's prerogative finally to decide; rather adequacy 'is itself a federal question.'"  *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

[58] *See supra* note 53.

[59] *See supra* note 54.

[60] Dobyne can easily show cause for his default, because the constitutional basis for the claim he now asserts did not exist until June 24, 2002.  He also can show prejudice and/or manifest injustice because, if he proves that he is mentally retarded, he is categorically ineligible for the death

For all of the foregoing reasons, this court concludes that Dobyne is entitled to assert his Eighth Amendment claim in this court.

**3**.    *The merits of the claim*

Respondent denies that Dobyne is mentally retarded, and argues that, measured by "any standard that has been adopted by any State in the Union, . . . Dobyne is not mentally retarded.  [He does not] meet the clinical definitions of mental retardation promulgated by the American Association of Mental Retardation or the American Psychiatrist Association."[61]

      **a**.    *Standards for determining mental retardation suggested by the Supreme Court's opinion in* Atkins

The Supreme Court did not dictate a national standard for determining mental

---

penalty.  *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent [of the death penalty], a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent [of the death penalty].'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray v. Carrier*, 477 U.S. at 496)).

[61] Doc. no. 50 (*Respondent's Supplemental Brief Addressing the Inapplicability of the Ring and Atkins Decisions*), at 7.  Respondent cites portions of the extensive state court record in his supplemental brief, in conjunction with diagnostic criteria, to support the argument that Dobyne is not mentally retarded.  *See id*. at 7-27.

retardation in *Atkins*.  Instead, the Court said that:

> To the extent there is serious disagreement about the execution of
> mentally retarded offenders, it is in determining which offenders are in
> fact retarded. . . .  Not all people who claim to be mentally retarded will
> be so impaired as to fall within the range of mentally retarded offenders
> about whom there is a national consensus.  As was our approach in *Ford
> v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, "we leave
> to the State[s] the task of developing appropriate ways to enforce the
> constitutional restriction upon [their] execution of sentences." *Id.*, at
> 405.

*Atkins v. Virginia*, 536 U.S. at 317 (footnote omitted).  The omitted footnote observed

that, even though the statutory definitions of mental retardation adopted by Congress

and the twenty states that prohibited the execution of such persons were not identical,

all of them "generally conform[ed] to the clinical definitions" promulgated by the

American Association on Mental Retardation and the American Psychiatric

Association.  *Id.* at 317 n.22.  The Court sketched the parameters of those definitions

as follows:

> The American Association on Mental Retardation (AAMR)
> defines mental retardation as follows:  "*Mental retardation* refers to
> substantial limitations in present functioning.  It is characterized by
> significantly subaverage intellectual functioning, existing concurrently
> with related limitations in two or more of the following applicable
> adaptive skill areas: communication, self-care, home living, social skills,
> community use, self-direction, health and safety, functional academics,
> leisure, and work. Mental retardation manifests before age 18." Mental
> Retardation: Definition, Classification, and Systems of Supports 5 (9th
> ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.,* at 42-43.

*Atkins v. Virginia*, 536 U.S. at 309 n.3 (emphasis in original).

When attempting to assess whether an individual's "intellectual functioning" is "significantly subaverage" — a diagnostic criterion central to both definitions of mental retardation quoted above — the *Atkins* Court pointed to the Wechsler Adult Intelligence Scales test (WAIS-III) as being

> *the standard instrument in the United States for assessing intellectual functioning.* AAMR, Mental Retardation, *supra*. The WAIS-III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). It is estimated that between 1 and 3 percent of the population has *an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition*. 2 Kaplan & Sadock's Comprehensive

29

Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed.2000).

*Atkins v. Virginia*, 536 U.S. at 309 n.5 (emphasis supplied).

Thus, the Supreme Court clearly pointed the states in the direction of clinical definitions of mental retardation that have three constituent parts: *i.e*., significantly substandard intellectual functioning as measured by such normative standards as the Wechsler Adult Intelligence Scales test, "the standard instrument in the United States for assessing intellectual functioning"; accompanied by significant limitations in adaptive skills in such areas as communication, self-care, and self-direction; and, both deficiencies must be manifest before the age of eighteen years. *See id*. at 318.

> **b**.    *The Alabama standard for determining mental retardation*

Following *Atkins*, the Alabama Supreme Court urged the state legislature "to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution." *Ex parte Perkins*, 851 So. 2d 453, 455 n.1 (Ala. 2002).[62]    In the breach, the *Perkins* Court applied a broad

---

[62] Although encouraged by the Alabama Supreme Court to formulate procedures for determining whether a capital defendant is mentally retarded, the Alabama legislature still has failed to do so.  As such, the burden has fallen upon the state judicial branch to attempt to resolve justly numerous death penalty cases in which mental retardation is a core issue. *But see Ex parte Perkins*, 851 So. 2d at 457 (Johnstone, J., specially concurring) ("I do not necessarily join in that part of footnote 1 urging the Alabama legislature 'to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution.'  I neither encourage nor discourage such legislation. *This Court is capable of rightly resolving these issues if and when they are presented*, what the statutory scheme may be at the time.") (emphasis supplied).

definition of mental retardation gleaned from legislation enacted by eighteen states that prohibited the execution of mentally retarded individuals.  *See id*. at 456 n.3.  The consensus definition thus arrived-at and applied in *Perkins* contained the same constituent parts emphasized by the Supreme Court in *Atkins*:  that is, "a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior.  Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."  *Ex parte Perkins*, 851 So. 2d at 456.[63]

The Alabama Court of Criminal Appeals subsequently recognized that the definition promulgated in *Ex parte Perkins* was consistent with the definition of the term "mentally retarded person" adopted by the Alabama Legislature when enacting the State's "Retarded Defendant Act":  *i.e.*, "A person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period,

---

[63] The only, possibly-significant, deviation between this Alabama standard and that discussed by the Supreme Court in *Atkins* lies in the cutoff IQ score for determining subaverage intellectual functioning:  the Alabama Supreme Court placed the bar at 70, rather than the 70 to 75 standard that the *Atkins* Court stated was "*typically considered* the cutoff IQ score for the intellectual function prong of the mental retardation definition."  *Atkins v. Virginia*, 536 U.S. at 309 n.5 (emphasis supplied).

as measured by appropriate standardized testing instruments." *Morrow v. State*, 928 So. 2d 315, 322 (Ala. Crim. App. 2004) (quoting Ala. Code § 15-24-2(3) (1975) (1995 Replacement Vol.));[64] *see also Stallworth v. State*, 868 So. 2d 1128, 1182 (Ala. Crim. App. 2003) (noting that "[t]his definition is consistent with the majority of those states that have legislation prohibiting the execution of a mentally retarded defendant but that do not establish a specific IQ score as a barrier").

The current procedures for addressing the question of whether a particular capital defendant is mentally retarded were promulgated by the Alabama Court of Criminal Appeals in *Morrow v. State,* 928 So.2d 315 (Ala. Crim. App. 2004), as follows:

> We agree with the Alabama Supreme Court that appellate courts should "refrain from making policy decisions with regard to claims of mental retardation by capital defendants." *Ex parte Perkins*, 851 So.2d at 455 n. 1.  However, this Court cannot hold death-penalty cases indefinitely;

---

[64]As the *Morrow* Court observed, Alabama's "Retarded Defendant Act," codified at Ala. Code § 15-24-1 *et seq.*,

> consists of seven short sections and basically authorizes the defendant or the State to file an affidavit with the trial court establishing that the defendant "is a person who has been identified as mentally retarded and [who] has received or is presently receiving services through the Department of Mental Health and Mental Retardation, a program certified by the Department of Mental Health and Mental Retardation, or the Department of Education." § 15-24-3, Ala.Code 1975.  The affidavit may then be used by the parties and the court "in connection with the decisions relative to bail hearings, determination of place of detention, and ultimate disposition of such case." § 15-24-4, Ala.Code 1975.

*Morrow v. State*, 928 So. 2d 315, 317 n.2 (Ala. Crim. App. 2004).

as the State has so often noted in its motions filed with this Court requesting timely disposition of death-penalty cases, justice delayed is justice denied.  We must provide the trial court in this case, and trial courts in future cases, with some guidance on how to determine whether a capital defendant is mentally retarded.

Alabama's Retarded Defendant Act provides no insight as to what procedure the Legislature might adopt for implementing the constitutional restrictions on executing a mentally retarded defendant; it became law in 1985, long before *Atkins* was decided.  However, Rule 32, Ala. R. Crim. P., has a procedure for determining whether a defendant is entitled to postconviction relief, and issues relating to *Atkins* have been resolved in previous cases under Rule 32.  Although Rule 32 was adopted by the Alabama Supreme Court as an avenue for postconviction relief, the procedure provided therein is simple and can easily be applied outside the postconviction setting to determine whether a capital defendant is mentally retarded.

Rule 32 places the burden of persuasion on the defendant to establish that he or she is entitled to an evidentiary hearing.  *See* Rule 32.3 and Rule 32.6(b).  Once the defendant meets his or her initial burden, an evidentiary hearing must be held, see Rule 32.9, at which time the defendant has the burden of proving by a *preponderance of the evidence* that he or she is entitled to relief, see Rule 32.3.  Following the hearing, the trial court is required to issue specific written findings of fact regarding the defendant's claim for relief.  See Rule 32.9(d).

*Morrow*, 928 So. 2d at 322-23.  (footnote and some citations omitted).

Dobyne and respondent have exhaustively mined the record on direct appeal and collateral review, searching for evidence pertinent to the issue of Dobyne's alleged mental retardation.[65]  This court has carefully examined each citation and,

---

[65] Dobyne: Doc. no. 41 (*Final Amended Petition for Writ of Habeas Corpus*), at 8-21 & Doc. no. 54, at 9-43.  Respondent:  Doc. no.  50, at 7-27.

construing the facts in the light most favorable to Dobyne, it is clear that he has stated a colorable claim of mental retardation, but genuine issues of material fact still exist. Dobyne presents evidence tending to show that he is mildly mentally retarded, while respondent focuses upon evidence showing that Dobyne is of borderline intelligence. This dispute prohibits the court from granting respondent's motion for summary judgment.[66]   Accordingly, respondent's motion for summary judgment is DENIED, and Dobyne will be accorded an evidentiary hearing on this issue.

## B.   Juror Misconduct and Extraneous Evidence

The second claim raised in Dobyne's final amended petition is the allegation that, due to misconduct on the part of the jury's foreperson, Ms. Mary Ann Moody, he was deprived of an impartial jury, due process of law, a fair trial, and a reliable determination of punishment — rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.   Specifically, Dobyne claims that,

> [d]uring jury selection, the prosecutor asked the entire panel of prospective jurors whether there was "anyone who knows the Defendant, Willie Dobyne, who is seated here?" (R. 258). While four people raised their hands, Mary Ann Moody did not. (R. 259). Ms.

---

[66]   The petitioner recently cited *Holladay v. Campbell*, 2006 WL 3147404, No. CV 03-PT-1323-M (N. D. Ala. October 12, 2006), arguing that the facts of that case are similar to the facts of Dobyne's case.   In *Holladay*, Senior United States District Judge Robert B. Propst not only granted a hearing on the issue of mental retardation, but also granted relief to the petitioner on that issue.

34

Moody subsequently sat on the jury and became the jury foreperson. (C. 2706-08). Later, Ms. Moody was one of ten jurors who voted to sentence Mr. Dobyne to death. (C. 51).

During their investigation of Mr. Dobyne's state post-conviction petition, counsel for Mr. Dobyne learned that Ms. Moody, who was the special education coordinator in the Bibb County schools, had significant contact with Mr. Dobyne's teachers concerning him when he was a student there. Indeed, Ms. Moody was on a committee that met to determine whether an incident of misbehavior by Mr. Dobyne in school was related to his mental retardation, precisely one of the issues in this case. (C. 2704). *While Mr. Dobyne's trial lawyers knew at the time of trial that Ms. Moody was an administrator in the county school system, they did not know that she had any particular knowledge of Mr. Dobyne.* (C. 1429).

Further post-conviction investigation revealed that Ms. Moody had been a forceful advocate for the death penalty for Mr. Dobyne. (C. 2710-11). In addition, it turned out that Ms. Moody had relied on her experience with mental health issues to convince the other jurors that Mr. Dobyne was not as mentally retarded as he was portrayed as being[,] and that his behavior was not influenced by whatever mental difficulties he may have had. (C. 2710). *She, moreover, told the other jurors that they should ignore the evidence that had been presented in court and should rely on her expertise instead.* (C. 2710).[67]

Dobyne asserts that, due to Ms. Moody's misconduct and introduction of extraneous evidence into the jury's deliberations, he is entitled to a new trial and/or a new sentencing hearing before an impartial jury. He requests an evidentiary hearing to present evidence in support of this claim.

---

[67] Doc. no. 41 (*Final Amended Petition for Writ of Habeas Corpus*), at 19-20 (emphasis supplied) (footnote omitted).

Respondent concedes that the first portion of this claim — the contention that Ms. Moody failed to truthfully respond to questions during *voir dire* — is properly before this court and subject to review under 28 U.S.C. § 2254(d).  However, respondent argues that the second portion of this claim — the contention that Ms. Moody introduced extraneous evidence, and was a forceful advocate for the death penalty, during the jury's sentencing deliberations — is procedurally defaulted, because Dobyne could have, but did not, raise the claim during Rule 32 proceedings.[68]  Respondent is mistaken.  In his brief on appeal from the trial court's denial of his Rule 32 petition, Dobyne alleged that:

> Because of her extensive prior contact with Mr. Dobyne, Ms. Moody was a uniquely influential juror.  She was the foreperson of the jury, and voted for death.  C. 2707, 51.  According to another juror, Ms. Moody was a forceful advocate for the death penalty for Mr. Dobyne. C. 2710.  Ms. Moody told the other jurors that they should rely on her expertise and ignore the evidence being presented in court.  C. 2710. She insisted that Mr. Dobyne was not as mentally retarded as he was portrayed in court[,] and that his behavior was not influenced by whatever mental difficulties he may have had.  C. 2710.

> Ms. Moody's assertions in the jury room — that Mr. Dobyne's behavior was not affected by his mental retardation — were strikingly similar to the conclusion that she had drawn about Mr. Dobyne in an earlier incident in which he had been accused of misconduct.  Ms. Moody sat on a committee that met to determine whether Mr. Dobyne's misbehavior was "effected (sic) by or relevant to his exceptionality,"

---

[68] Doc. no. 48 (*Answer to Dobyne's Final Amended Petition for Writ of Habeas Corpus*), at 14-15.

which was listed as "Educable Mentally Retarded." C. 2704. Ms. Moody and the committee found that Mr. Dobyne['s] retardation was irrelevant to his behavior, and that he was "completely accountable for his actions" despite his mental deficiencies. C. 2704.

This assessment was precisely the same determination that the jury in Mr. Dobyne's death penalty case was faced with. Mr. Dobyne's lawyers acknowledged that he was responsible for the death of one of the victims, but argued that, because of his cognitive limitations, he should receive a sentence less than death. *See, e.g.*, T. 795-96. Of course, Ms. Moody had already confronted this issue with respect to Mr. Dobyne, and her judgment as foreperson of the jury was the same as her earlier judgment when Mr. Dobyne was a student: his mental retardation was not a mitigating factor.[69]

Although the Alabama Court of Criminal Appeals did not address this portion of Dobyne's claim in its opinion affirming the trial court's denial of his Rule 32 petition, Dobyne again raised the "forceful advocate for the death penalty" portion of the claim in the brief he submitted to the Supreme Court of Alabama, in support of his petition for writ of certiorari.[70]

In denying Dobyne's petition for writ of certiorari, the Alabama Supreme Court acknowledged (and addressed the substance of) the affidavit of juror Glenda Snelson, who averred that Ms. Moody had been "very influential on the rest of the jury," and that she was "very forceful in her support of the death penalty for Mr. Dobyne," when

---

[69] Respondent's Exhibit R-53 (*Dobyne's Brief on Appeal from Denial of Rule 32 Petition*), at 41-43.

[70] *See* Respondent's Exhibit R-57 (*Dobyne's Brief in Support of Petition for Writ of Certiorari to the Alabama Court of Criminal Appeals*), at 50-52.

addressing the issue of prejudice resulting from Ms. Moody's failure to acknowledge during voir dire that she knew Dobyne. *See Ex parte Dobyne*, 805 So.2d 763, 772 (Ala. 2001). In fact, the Alabama Supreme Court presumed that juror Glenda Snelson's affidavit had been considered by the trial court:

> The trial court, in its order denying Dobyne's Rule 32 petition, extensively addressed [factors used to discern prejudice] in determining that juror M.A.M.'s failure to respond did not present a situation that might have been prejudicial to Dobyne. While Dobyne presented an affidavit of a juror, G.S., that stated M.A.M. had improperly influenced the jury to consider her knowledge of mental retardation, rather than the evidence presented at trial, we have stated in other contexts, "[we] grant great deference to the trial judge, who is on the scene and who can best judge the credibility of the participants and determine what actually occurred."

*Id.* (quoting *Ex parte Pressley*, 770 So.2d 143, 147 (Ala. 2000)). Because Dobyne clearly raised the "forceful advocate for the death penalty" portion of his juror misconduct claim in state court, he is not procedurally barred from presenting the claim in this court.

Further, Dobyne raised "Misconduct by the jury foreperson" as one of the claims asserted in the first amended Rule 32 petition filed in the Bibb County Circuit Court on November 21, 1997. He argued that his

> rights to an impartial jury, due process, a fair trial, and a reliable determination of punishment, guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 6, 11, 13, and 15 of the Alabama Constitution

were violated by misconduct on the part of the foreperson of the jury
that convicted Mr. Dobyne and sentenced him to death.

The foreperson of the jury had personal knowledge of Mr.
Dobyne, and did not disclose this fact during voir dire. The presence on
the jury of a juror who had extensive contact with Mr. Dobyne and
significant independent knowledge of Mr. Dobyne rendered the trial
fundamentally unfair, and Mr. Dobyne is therefore entitled to a new
trial.[71]

Respondent argued that this claim was barred from review by Alabama Rules of

Criminal Procedure 32.2(a)(3) and (a)(5), because it could have been, but was not,

raised at trial or on direct appeal.[72]  The Rule 32 trial court accepted that argument,

and entered an order dismissing the juror misconduct claim on February 5, 1998,

saying that it was "procedurally barred pursuant to Rule 32.2(a) of the Alabama Rules

of Criminal Procedure."[73]  Nevertheless, the Rule 32 court inconsistently conducted

an evidentiary hearing on the claim, at which the State of Alabama was allowed to

present evidence contradicting the bona fides of the claim, but, shockingly, Dobyne

was arbitrarily precluded from submitting any evidence in support of his

contentions.[74]

---

[71] *See* C. 360-361.

[72] C. 395, 405.

[73] *See* C. 441.

[74] C. 1-55.  Apparently, the evidentiary hearing was held on September 19, 1997, and March
2, 1998.  C. 1.

39

Dobyne filed a brief in support of his Rule 32 petition in the trial court on June

15, 1998, arguing that:

> Alabama Law is clear that a claim regarding a juror, such as the claim in this case, is cognizable in a Rule 32 proceeding.  For example, in *State v. Freeman*, 605 So. 2d 1258 (Ala. Crim. App. 1992), the Alabama Court of Criminal Appeals faced a strikingly similar juror claim.

> In *Freeman*, defense counsel learned during his investigation prior to the Rule 32 proceeding that the jury foreperson had been a police chief, but had not disclosed this fact on voir dire.  In this case, defense counsel has learned that the jury foreperson had known Mr. Dobyne for approximately ten to twelve years prior to his trial and had significant contact with him during that time, but did not disclose this fact on voir dire.  In *Freeman*, the Court of Criminal Appeals granted the defendant a new trial.  *Freeman*, 605 So. 2d at 1259-1260.

> The Court found this claim procedurally barred pursuant to Alabama Rule of Criminal Procedure 32.2, subsections (a)(3), (a)(4), and (a)(5).  None of these procedural bars should apply to this claim.

> Rule 32.2(a)(3) bars from relitigation in a Rule 32 proceeding any claim that could have been[,] but was not[,] raised at trial.  This is not such a claim.  In *Freeman*, the Alabama Court of Criminal Appeals held that, because defense counsel did not learn of the juror's failure to answer voir dire questions truthfully until his Rule 32 investigation, the claim was not procedurally barred.  *Id.*, 605 So. 2d at 1259.  In other words, because trial counsel did not know at trial that the juror had not been truthful on voir dire, the claim was not procedurally barred in a Rule 32 proceeding.

> Rule 32.2 subsections (a)(4) and (a)(5) bar from relitigation in a Rule 32 proceeding any claim which was raised on appeal or which could have been raised on appeal.  Again, in *Freeman*, the Court of Criminal Appeals specifically found that the claim of juror misconduct

was not procedurally barred. *Id.*, 605 So. 2d at 1259. The Court of Criminal Appeals found that, because the truth about the juror — which was not disclosed on voir dire — constituted newly discovered evidence, the claim "was not procedurally barred by Rule 32.2(a)(4) and (5)." *Id.*, 605 So. 2d at 1259.

Because this is a death penalty case, Mr. Dobyne's guilt and his degree of moral responsibility must be determined by a fairly-constituted and impartial jury. *Woodson*, 428 U.S. at 305; *Gardner*, 430 U.S. at 357-58; *Lockett*, 438 U.S. at 604; *Beck*, 447 U.S. at 637-38; *Eddings*, 455 U.S. at 118 (O'Connor, J., concurring); *Coleman*, 451 U.S. 949 (1981)(Stevens, J., concurring in denial of certiorari). Mr. Dobyne's rights to a fair and impartial jury, a reliable determination of punishment, and effective assistance of counsel were violated by the presence of an unqualified juror. The constitutional rights at issue are guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 6, 8, 11, and 15 of the Alabama Constitution.

Although the Court found the claim to be procedurally barred and thereby prevented Mr. Dobyne from presenting evidence and proving it, the Court allowed the State to present evidence. The entirely one-sided litigation of this issue means that the record does not reflect the whole truth about the claim. If Mr. Dobyne had been permitted to present evidence, he could have proven the claim and he could have prevailed. It is fundamentally unfair and a denial of due process of law that the State was permitted to call a witness regarding a claim that was dismissed, particularly when the dismissal of this claim was the basis of the State's motion to prohibit Mr. Dobyne from taking depositions in support of the claim.

Nonetheless, the testimony of the juror only supports Mr. Dobyne's claim. She admitted that she knew Mr. Dobyne, that she had tested his I.Q., that she had determined that he should be placed in special education classes, and that she had participated in re-evaluations to determine if he should continue in special education. In addition, she admitted that during the trial, as she sat in judgment of Mr. Dobyne, she

realized that she knew him and that he had been one of her students. Although it is likely that the foreperson would have been qualified to sit as a juror in another case, she simply was not qualified to sit in judgment of Mr. Dobyne.

In addition, Mr. Dobyne's trial lawyer admitted that, had he known about the foreperson's extensive prior contact with Mr. Dobyne, he might not have wanted her on the jury.  (Owings dep. at 75, 76). Thus, there can be no question that the accurate information would have had a profound effect on the trial, and, if it had been known, the juror would not have been permitted to serve.[75]

The trial court entered an order denying all claims asserted in Dobyne's Rule 32 petition on September 9, 1998.[76]  With respect to the juror misconduct claim, that Court said this:

This Court initially found that the claim that the jury foreperson engaged in misconduct was barred.  *See* Order, 2-5-98.  The basis for Dobyne's claim was that Mary Ann Moody, the jury foreperson, knew Dobyne through her work as a special education coordinator for Bibb County.  Dobyne alleges that Ms. Moody committed misconduct by failing to answer during voir dire that she knew Dobyne from her prior dealings with him.

There is case authority from the Alabama Court of Criminal Appeals that holds claims such as the one presented here are not procedurally defaulted if the allegation concerns newly discovered evidence.  In *State v. Freeman*, 605 So. 2d 1258 (Ala. Crim. App. 1992), the Court reversed a capital murder conviction and death sentence because of the jury foreman's failure to reveal during voir dire that he was a former police officer.  The Court stated that Freeman's Rule 32

---

[75]  C. 2482-2485.

[76]  C. 2825-2865.

counsel only discovered the information regarding the jury foreperson one week before the Rule 32 evidentiary hearing. *Freeman*, 605 So. 2d at 1259. The Court found significant that "[d]efense counsel stated during the [Rule 32 evidentiary] hearing that if the juror had answered on voir dire that he had been a police officer he would have dismissed him from the panel of prospective jurors." *Id*. at 1260.

The facts regarding this claim are clearly distinguishable from the facts presented in *State v. Freeman*. Unlike *Freeman*, in this case the parties knew Ms. Moody's occupation and made a conscious decision to leave her on the jury. Owings's deposition at 43-46. Furthermore, the investigator used by trial counsel testified during his deposition that he discovered a copy of Dobyne's school records before trial and gave them to Bill Owings. Hartley's deposition at 20. Dobyne's school records contain documents indicating that more than ten years before trial, Ms. Moody administered an I.Q. test to Dobyne and signed off on documents concerning Dobyne. Trial counsel knew that Ms. Moody was a special education teacher/administrator. Owings's deposition at 45-46. Because of that, he felt that she would be a juror more receptive to the evidence presented by the defense. Trial counsel also knew that Dobyne had been in special education classes, as he called one of Dobyne's teachers as a witness. Given the size of Bibb County, Owings had the necessary knowledge to deduce that Ms. Moody may have had some contact with Dobyne at some point in his education. With all of this knowledge, trial counsel made a strategic decision to leave Ms. Moody on the jury. Because of the factual distinctions with *Freeman*, this Court finds this claim is procedurally defaulted from review because Dobyne has made no showing of newly discovered evidence.

Alternative to the holding of procedural default, this Court finds this claim to have no merit. This Court ordered the parties to present testimony during these Rule 32 proceedings by deposition. After most of the depositions were taken, the State filed a motion "to allow Mary Ann Moody to testify at the Rule 32 evidentiary hearing on March 2, 1998." *See* "Motion to Allow Live Testimony of Mary Ann Moody." As grounds for the motion, the State recited the following:

2.    During the depositions of Janice Parker, Jaunakee Davis, Sheila Lilly, and Ethel Evans, counsel for Dobyne introduced some documents signed by Mary Ann Moody.

3.    Additionally, counsel for Dobyne have mailed documents to the State for the purpose of stipulating to the documents' authenticity.  Among these documents are some of Dobyne's school records, some of which bear the signature of Mary Ann Moody.

4.    The State proffers that Mary Ann Moody will testify that, although she signed documents pertaining to Willie Dobyne, at the time of the trial, she had no recollection of him.  Ms. Moody therefore could not have relied on extraneous information in arriving at her verdict, as Dobyne contends in his Rule 32 amended petition.

*See* "Motion to Allow Live Testimony of Mary Ann Moody," filed February 20, 1998.

This Court allowed the State to call Ms. Moody as a witness at the evidentiary hearing.  The State showed Ms. Moody every document she had signed regarding Willie Dobyne.   Upon her review of the documents, Ms. Moody stated that they show only the personal contact she had with Dobyne was her administration of an I.Q. test on May 3, 1978, 14 years before she served on Dobyne's jury.  Ms. Moody stated that her signature on the other documents concerning Dobyne was based on information she received from other school personnel and not from any personal contact with Dobyne.  Based on her testimony, the Court finds that Ms. Moody did not withhold information during voir dire, but that, because of her minimal (almost non-existent) contact with Dobyne, she had no personal knowledge regarding Dobyne.  Therefore, Ms. Moody could not have relied on extraneous information in arriving at her verdict, as Dobyne alleged in his Rule 32 amended petition.  Even if this claim was not procedurally defaulted, the Court would find that

Dobyne's allegations are lacking of merit.[77]

On appeal from the denial of his Rule 32 petition, Dobyne claimed that he "was denied a full and fair hearing on his claim regarding the failure of the jury foreperson to disclose the true nature and extent of her relationship with Mr. Dobyne." Dobyne argued that

> [t]he entirely one-sided litigation of this issue means that the record does not reflect the whole truth about the claim. If Mr. Dobyne had been permitted to present evidence, he would have proven the claim. It is fundamentally unfair and a denial of due process of law that the state was permitted to call a witness regarding a claim that had been previously dismissed. Not surprisingly, in the order prepared by the state, the Circuit Court credits Ms. Moody's testimony to the effect that she had no significant contact with Mr. Dobyne when he was a student. C. 2834.

> The actual evidence stands in stark contrast to findings in the order prepared by the state's lawyers. Mr. Dobyne obtained sworn affidavits that are in the record from some of Mr. Dobyne's teachers, who worked under Ms. Moody, who were prepared to testify that Ms. Moody had had contact with Mr. Dobyne in their presence. By dismissing the claim and thereby preventing Mr. Dobyne from presenting evidence, the Circuit Court refused to consider any evidence that would have undermined the state's position. There was substantial evidence of Ms. Moody's significant contact with Mr. Dobyne during his time in school:

>> • Ethel Evans, Mr. Dobyne's high school special education teacher, swore that Ms. Moody visited her classroom approximately three times per month during the period that Mr. Dobyne was in the class. C. 2716. She swore that she was certain

---

[77] C. 2831-2835.

that Ms. Moody recognized Mr. Dobyne and knew his name.  C. 2716.  She recalled one incident in which Mr. Dobyne had misbehaved in another class.  Ms. Moody went to Ms. Evans to discuss the matter, and Ms. Moody knew both who Mr. Dobyne was and what he had done.  C. 2716.

• Juanakee Hudson Davis, Mr. Dobyne's seventh and eighth grade special education teacher, swore in her affidavit that Ms. Moody visited her classroom six to nine times per year when the children were present during the time that Mr. Dobyne was in her class.  C. 2713.  From this, Ms. Davis swore that she was certain that Ms. Moody recognized Mr. Dobyne and knew him by name.  C. 2713.

• Shelia Lilly, another of Mr. Dobyne's special education teachers, swore that she was certain that Ms. Moody recognized Mr. Dobyne and knew his name.  C. 2715.  In addition, she recalled one occasion in which she and Ms. Moody met to discuss Mr. Dobyne, and whether he should remain in special education classes.  This meeting included a discussion of Ms. Lilly's observations of Mr. Dobyne and an assessment of his test scores.  C. 2715.

Even the testimony from Ms. Moody herself supports Mr. Dobyne's position.  She admitted that she knew Mr. Dobyne, that she had tested his I.Q., C. 20, that she had determined that he should be placed in special education classes, and that she had participated in re-evaluations to determine whether he should continue in special education.  C. 23-26.  *In addition, she admitted that during the trial, as she sat in judgment of Mr. Dobyne, she realized that he had been a student in her charge.*  C. 52.  *After coming to this realization, she did nothing to bring this fact to the attention of the trial court or counsel.*  C. 53 - 54.  Although she might have been qualified to sit as a juror in another case, Ms. Moody simply was not qualified to sit in judgment of Mr. Dobyne, especially when she was charged with considering whether to sentence Mr. Dobyne to death despite his mental retardation.

Because of her extensive prior contact with Mr. Dobyne, Ms. Moody was a uniquely influential juror. She was the foreperson of the jury, and voted for death. C. 2707, 51. According to another juror, Ms. Moody was a forceful advocate for the death penalty for Mr. Dobyne. C. 2710. Ms. Moody told the other jurors that they should rely on her expertise and ignore the evidence being presented in court. C. 2710. She insisted that Mr. Dobyne was not as mentally retarded as he was portrayed in court and that his behavior was not influenced by whatever mental difficulties he may have had. C. 2710.

Ms. Moody's assertions in the jury room — that Mr. Dobyne's behavior was not affected by his mental retardation — were strikingly similar to the conclusion that she had drawn about Mr. Dobyne in an earlier incident in which he had been accused of misconduct. Ms. Moody sat on a committee that met to determine whether Mr. Dobyne's misbehavior was "effected (sic) by or relevant to his exceptionality," which was listed as "Educable Mentally Retarded." C. 2704. Ms. Moody and the committee found that Mr. Dobyne['s] retardation was irrelevant to his behavior, and that he was "completely accountable for his actions" despite his mental deficiencies. C. 2704.

This assessment was precisely the same determination that the jury in Mr. Dobynes's death penalty case was faced with. Mr. Dobyne's lawyers acknowledged that he was responsible for the death of one of the victims, but argued that, because of his cognitive limitations, he should receive a sentence less than death. *See, e.g.*, T. 795-96. Of course, Ms. Moody had already confronted this issue with respect to Mr. Dobyne, and her judgment as foreperson of the jury was the same as her earlier judgment when Mr. Dobyne was a student: his mental retardation was not a mitigating factor.

. . . .

Here, although Mr. Dobyne's trial lawyers were aware of Ms. Moody's occupation prior to trial, they were not aware of the extent and nature of her contact with Mr. Dobyne. They did not know that she had participated in evaluations of Mr. Dobyne to determine the extent of his

47

mental retardation, or that she had sat in judgment of him once before. . . . C. 1430.

    . . . .

    Mr. Dobyne's trial lawyer admitted that, at the time of trial, he was not aware that Mr. Moody already once had sat in judgment of Mr. Dobyne.  C. 1429-30.  Further, he acknowledged that if he had known about Ms. Moody's extensive prior contact with Mr. Dobyne, he might not have wanted her on the jury.  C. 1430.  Thus, there can be no question that the accurate and complete information constituted newly-discovered evidence, and that this information would have had a profound effect on the trial.  If the truth had been known at trial, the juror would most likely have been excused for cause or been the subject of a defense peremptory strike.

    The "failure of a juror to answer the question posed by defense counsel require[s] a new trial" if "the action of the juror <u>might</u> have unlawfully influenced the verdict . . . .  This test casts a light burden on the defendant."  *Freeman*, 605 So. 2d at 1259-60 (internal citations and quotations omitted).  In this case, it was Ms. Moody's asserted knowledge of mental retardation and her contention that Mr. Dobyne was not as retarded as the defense made him out to be that made her such a powerful juror.  There can be no doubt that her presence on Mr. Dobyne's jury prejudiced him, especially as to penalty.

    . . . Mr. Dobyne's convictions and death sentence should be vacated, and he should be granted a new trial by an impartial jury.  In the alternative, this Court should remand the case to the Circuit Court, to allow Mr. Dobyne to present evidence in support of this claim so that this court can consider the claim on a complete and accurate factual record.[78]

In his reply brief, Dobyne reiterated his argument that he was denied a fair

---

[78] Respondent's Exhibit R-53 (*Dobyne's Brief on Appeal from Denial of Rule 32 Petition*), at 38-43, 45-46, 47-48, and 49-50 (emphasis supplied) (footnotes omitted).

hearing on his juror misconduct claim.[79]   Nevertheless, the Alabama Court of

Criminal Appeals affirmed the trial court's denial of the juror misconduct claim,

saying:

> Dobyne contends that the circuit court erred in denying his claim that his rights to an impartial jury, due process, a fair trial, and a reliable determination of punishment were violated because, he says, the jury foreperson engaged in misconduct.  Specifically, he argues that the jury foreperson did not disclose during voir dire that she knew him personally.  (Claim Y. in Dobyne's first amended petition at C.R. 360-61.)

> "Before a claim of juror misconduct may be addressed on the merits in a postconviction petition the petitioner must meet the requirements for newly discovered evidence contained in Rule 32.1(e), Ala.R.Crim.P." *Brown v. State*, [Ms. CR-98-0343, Oct. 1, 1999] — So. 2d — (Ala. Cr. App. 1999).

> Rule 32.1(e) states that a defendant who has been convicted of a criminal offense may seek relief on the following basis:

>> "(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

>>> "(1) The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

>>> "(2) The facts are not merely cumulative to other

---

[79] *See* Respondent's Exhibit R-55 (*Dobyne's Reply Brief on Appeal from Denial of Rule 32 Petition*), at 16-25.

facts that were known;

"(3) The facts do not merely amount to impeachment evidence;

"(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

"(5) The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received."

Dobyne has not satisfied the requirements for newly discovered evidence. Specifically, Dobyne has not shown that he and his counsel were unaware at the time of his trial that "[Juror M.A.M.] knew [him], had contact with him, and had discussions with other teachers about him, his behavior, and his disability." (Dobyne's reply brief to this Court at p. 17.) The record indicates that Dobyne was aware that Juror M.A.M. was involved in the special education program in which he had participated. Owings testified, during his deposition, that he knew that Juror M.A.M. was a special education coordinator and acknowledged that he had school records in his trial file bearing her signature. Thus, Dobyne was aware that [Juror M.A.M.] had had contact with him through the school system and has failed to establish that the Juror M.A.M.'s relationship with him was unknown, as required for relief under Rule 32.1(e)(1), Ala.R.Crim.P.

Recognizing that at the time Dobyne's petition was filed the law addressing claims in postconviction petitions of juror misconduct was conflicting, we also address this claim on the merits. *See Ex parte Pierce*, [Ms. 1981270, May 26, 2000] (holding that a petitioner can allege a constitutional claim of juror misconduct).

To determine whether a defendant was prejudiced by a juror's failure to respond truthfully to a question during voir dire examination, the test is whether the defendant actually was prejudiced. *Knight v.*

*State*, 710 So. 2d 511 (Ala. Cr. App. 1997).  *See Dawson v. State*, 710 So. 2d 472 (Ala. 1997).  To assist in determining whether there was prejudice, the following factors are pertinent:

> "'[The] temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'"

*Tomlin v. State*, 695 So. 2d 157, 170 (Ala. Cr. App. 1996), *quoting Johnson v. State*, 536 So. 2d 957, 958 (Ala. Cr. App. 1987), *cert. denied*, 490 U.S. 1046, 109 S. Ct. 1955, 104 L. Ed. 2d 424 (1989).  "'Thus, the facts in each case must be considered individually and much will remain in the discretion of the trial judge.'"  *Tomlin*, 695 So. 2d at 170, *quoting Parish v. State*, 480 So. 2d 29, 30 (Ala. Cr. App. 1985).

The record on direct appeal indicates that Juror M.A.M. did not respond to the prosecutor's question, "Is there anyone who knows the defendant, Willie Dobyne.  He's seated over here."

Juror M.A.M., a psychometrist and special education coordinator for Bibb County for over 24 years, served as the foreperson of Dobyne's jury.  Dobyne was a special education student at the time Juror M.A.M. served in these capacities.  During the evidentiary hearing, Juror M.A.M. testified that school records reflected that in 1978, 14 years before Dobyne's trial, she had administered a "five-minute" psychological examination to Dobyne.  According to Juror M.A.M., she administered at least 120 of these examinations each year.  Juror M.A.M. testified that as part of the examination process, Dobyne provided background information about himself and his family.  Juror M.A.M. further testified that as part of her responsibility as special education coordinator she consulted with Dobyne's classroom teacher about Dobyne's performance.  Although the classroom teacher developed Dobyne's individual education plan, she reviewed and signed the teacher's recommendation.  Juror M.A.M. testified that with the exception of the time in 1978 when she administered an examination to

Dobyne, Dobyne was not present during her consultations with Dobyne's teachers.

Juror M.A.M. further testified that school records indicated that in October 1984, she served on a committee that determined an appropriate disciplinary action for Dobyne. Juror M.A.M. testified that she did not recall the instances that gave rise to Dobyne's being subjected to discipline. According to Juror M.A.M., the principal essentially requested her professional opinion based on Dobyne's behavior and on his academic performance as to the most effective means of discipline. Juror M.A.M. estimated that she made between 10 and 20 of these assessments of different students each year. Juror M.A.M. never talked with Dobyne; her opinion was formed from the information provided by the school personnel.

According to Juror M.A.M., despite her contact with Dobyne through her work as special education coordinator, at the time of the trial she did not recognize him, did not have any personal knowledge of him, and did not recall anything about her association with him through the educational system. Her testimony is substantiated by her candor during voir dire that she had read about the murders in the newspaper. Juror M.A.M. further testified that she based her decision that Dobyne was guilty in accordance with the trial court's instructions as applied to the evidence presented. While Juror M.A.M. admitted that at some point during the trial she realized that Dobyne was a special education student and that he would have come under her jurisdiction as a special education coordinator/administrator, she did not know him. She stated,

"[Y]ou know, honestly just because he was in special ed didn't mean I knew him.

". . . .

"I deal with children on a daily basis. At that point, the[re] were probably three or four hundred people identified. At this point there's six or seven hundred. Something would come up about a child I had a year ago and I wouldn't be able to recall it."

52

(R. 188.)

We are unwilling to say that Juror M.A.M. failed to respond truthfully to a question asked during voir dire examination. Her testimony at the Rule 32 hearing indicated that she had limited contact with numerous students during a school year and that, while she may have discussed a student's performance with a teacher and signed an evaluation for the student, she had extremely limited contact with the students themselves. Juror M.A.M.'s testimony clearly indicates that she had no specific recollection of Dobyne and that, although she may have recognized his name at some point during the trial, she had no further recollection of him. Therefore, we do not find that Juror M.A.M.'s failure to respond to this question constitutes intentional juror misconduct.

Moreover, Juror M.A.M. testified at the Rule 32 hearing that even though it appeared that she had had contact with Dobyne, she based her verdict on the testimony presented and on the trial court's instructions. Because no evidence was presented that Juror M.A.M.'s limited knowledge of Dobyne actually prejudiced Dobyne, we find no basis for reversal on this ground. *See Jones v. State, supra*.

Furthermore, we reject Dobyne's argument that he should have been allowed to present testimony from Dobyne's special education teachers that they had discussed Dobyne with Juror M.A.M. The inquiry before the circuit court focused on Juror M.A.M.'s personal knowledge of Dobyne and her recollection of Dobyne. Therefore, the testimony of the other witnesses would not be relevant to this issue.

*Dobyne v. State*, 805 So. 2d 733, 758-760 (Ala. Crim. App. 2000) (footnotes omitted).

Dobyne reiterated his juror misconduct claim in the petition for writ of certiorari he subsequently filed in the Alabama Supreme Court.[80] When affirming the

---

[80]   Respondent's Exhibit R-56 (*Dobyne's Petition for a Writ of Certiorari*), at 9-10; Respondent's Exhibit R-57 (*Dobyne's Brief in Support of Petition for Writ of Certiorari*), at 43-59.

denial of Dobyne's Rule 32 petition, the Alabama Supreme Court said this about his

juror misconduct claim:

> Dobyne's specific argument with respect to juror misconduct is that the opinion of the Court of Criminal Appeals conflicts with *Ex parte Pierce* [Ms. 1981270, Sept. 1, 2000] — So. 2d — (Ala. 2000).  In his appeal to the Court of Criminal Appeals, Dobyne argued that the trial court denied him an appropriate hearing on his postconviction claims that the jury foreperson had failed to disclose the full nature and extent of her relationship with him, and that her presence on the jury had deprived him of a fair trial.

> The Court of Criminal Appeals addressed Dobyne's argument in part by stating:

>> "Dobyne contends that the circuit court erred in denying his claim that his rights to an impartial jury, due process, a fair trial, and a reliable determination of punishment were violated because, he says, the jury foreperson engaged in misconduct.  Specifically he argues that the jury foreperson did not disclose during voir dire that she knew him personally. (Claim Y. in Dobyne's first amended petition at C.R. 360-61.)

>> "'*Before a claim of juror misconduct may be addressed on the merits in a postconviction petition the petitioner must meet the requirements for newly discovered evidence contained in Rule 32.1(e), Ala. R. Crim. P.*'"  *Brown v. State*, 807 So. 2d 1 (Ala. Cr. App. 1999).

*Dobyne v. State*, 805 So.2d at 758.  (Emphasis added.)  Although the Court of Criminal Appeals then went on to address Dobyne's claim on the merits, the language quoted above is at some variance with our holding in *Ex parte Pierce, supra*.  However, we note that the Court of Criminal Appeals referred to our original opinion in *Pierce*, released May 26, 2000, to further address Dobyne's claim on the merits — but this Court, on September 1, 2000, on application for rehearing, withdrew

its May 26, 2000, opinion and issued a new opinion.

In the September 1, 2000, *Pierce* opinion, this Court considered a similar claim of juror misconduct.  We stated:

> "The decisive issue in this case is whether Pierce's claim is procedurally barred under Rule 32.2(a)(3) and (5), Ala. R. Crim. P.
>
> "Pierce's claim states a proper ground for relief under Rule 32.1(a) because it states a constitutional violation that would require a new trial.  To be entitled to that relief, however, Pierce must avoid the preclusive effect of Rule 32.2(a)(3) and (5); those provisions bar a defendant from presenting in a Rule 32 postconviction petition a claim that could have been raised at trial or on direct appeal."

— So.2d at —.  This Court then quoted the applicable rules, including Rules 32.1 and 32.2, Ala. R. Crim. P.  After reviewing the language of the Rules, we further stated:

> "The Court of Criminal Appeals stated that Pierce had failed to prove that his evidence regarding the sheriff's improper contact with the jury constituted newly discovered evidence; therefore, it held, the trial court correctly held this claim to be procedurally barred on the basis that it could have been raised at trial or on direct appeal.  The Court of Criminal Appeals held Pierce did not satisfy the following three of the five elements required by Rule 32.1(e), Ala. R. Crim. P.: 1) that the information was not known and could not have been discovered at the time of trial or sentencing or in time to raise it in a posttrial motion; 2) that if the information 'had been known at the time of trial or of sentencing, the result probably would have been different'; and 3) that '[t]he facts establish that the [defendant] is innocent of the crime' or that he 'should not have received the sentence [he] received.'

"However, Pierce was not required to prove that this information meets the elements of 'newly discovered material facts' under Rule 32.1(e).  While the information about Sheriff Whittle's contacts with the jury may be 'newly discovered,' Pierce does not seek relief under Rule 32.1(e).  Pierce does not contend that '[n]ewly discovered material facts exist which require that the conviction or sentence be vacated by the court.' Rule 32.1(e).  Instead, Pierce's claim fits under Rule 32.1(a): 'The constitution of the United States or of the State of Alabama requires a new trial. . . .'  Rule 32.1(a) states a ground for relief distinct from that stated in Rule 32.1(e).  If every defendant had to prove that the facts on which he relies for postconviction relief satisfy the elements of 'newly discovered material facts' set out by Rule 32.1(e), then constitutional violations could rarely be raised in a Rule 32 petition, and Rule 32.1(a) would be superfluous for all cases except those in which the defendant could prove innocence.  There is a place for this Court to review constitutional violations that could not be discovered by the date of trial or in time to be raised in a direct appeal, even if the defendant is guilty of the crime charged.  Furthermore, the application of the requirements of Rule 32.1(e) in cases like Pierce's would impose a nearly impossible standard on a defendant filing a Rule 32 petition.  A defendant could rarely, if ever, establish, through the same facts tending to prove that the jury was prejudiced or improperly influenced, that he is innocent of the crime charged.  Yet, jury prejudice or improper influence is an important issue for this Court to review."

— So.2d at —.

We write to illustrate how the facts of *Pierce* are distinguishable from the facts presented here.  In *Pierce*, the petitioner alleged that the sheriff, who was called as a key witness in his case, had substantial contacts with the jury during the trial.  The trial court dismissed the claim as procedurally barred; the Court of Criminal Appeals affirmed, holding that the issue was procedurally barred by Rule 32.2(a)(3) and (5), i.e., that it could have been, but was not, raised at trial or on appeal,

and, additionally, that it did not meet the requirements of a "newly discovered material fact" as imposed by Rule 32.1(e). This Court held that a juror-misconduct claim need not meet the requirements of Rule 32.1(e) to be considered by the trial court and pointed out that a juror-misconduct claim implicates constitutional violations under Rule 32.1(a); this Court also noted that such a claim remains subject to the preclusive bars found in Rule 32.2. This Court thereafter remanded the case for the Court of Criminal Appeals to remand it to the trial court because the record was not clear as to whether the trial court had heard Pierce's juror-misconduct claim on its merits.

The facts presented by Dobyne's petition are clearly different. The trial court did address Dobyne's claim of juror misconduct on its merits. In its order denying that claim, the trial court stated:

> "This Court initially found that the claim that the jury foreperson engaged in misconduct was barred. See Order, 2-5-98. The basis for Dobyne's claim was that [M.A.M.], the jury foreperson, knew Dobyne through her work as a special education coordinator for Bibb County. Dobyne alleges that [M.A.M.] committed misconduct by failing to answer during voir dire that she knew Dobyne from her prior dealings with him.

> "There is case authority from the Alabama Court of Criminal Appeals that holds claims such as the one presented here are not procedurally defaulted if the allegation concerns newly discovered evidence. In *State v. Freeman*, 605 So. 2d 1258 (Ala. Crim. App. 1992), the Court reversed a capital murder conviction and death sentence because of the jury foreman's failure to reveal during voir dire that he was a former police officer. The Court stated that Freeman's Rule 32 counsel only discovered the information regarding the jury foreperson one week before the Rule 32 evidentiary hearing. *Freeman*, 605 So. 2d at 1259. The Court found significant that "[d]efense counsel stated during the [Rule 32 evidentiary] hearing that if the juror had answered on voir dire that he had been a police officer he would have dismissed him from the panel of prospective jurors." *Id.* at 1260.

57

"The facts regarding this claim are clearly distinguishable from the facts presented in *State v. Freeman*. Unlike *Freeman*, in this case the parties knew [M.A.M.'s] occupation and made a conscious decision to leave her on the jury. [Owings's] deposition at 43-46. Furthermore, the investigator used by trial counsel testified during his deposition that he discovered a copy of Dobyne's school records before trial and gave them to Bill Owings. Hartley's deposition at 20. Dobyne's school records contain documents indicating that more than ten years before trial, [M.A.M.] administered an IQ test to Dobyne and signed off on documents concerning Dobyne. Trial counsel knew that [M.A.M.] was a special education teacher/administrator. Owings's deposition at 45-46. Because of that, he felt that she would be a juror more receptive to the evidence presented by the defense. Trial counsel also knew that Dobyne had been in special education classes, as he called one of Dobyne's teachers as a witness. Given the size of Bibb County, Owings had the necessary knowledge to deduce that [M.A.M.] may have had some contact with Dobyne at some point in his education. With all of this knowledge, trial counsel made a strategic decision to leave [M.A.M.] on the jury. Because of the factual distinctions with *Freeman*, this Court finds this claim is procedurally defaulted from review because Dobyne has made no showing of newly discovered evidence.

"*Alternative to the holding of procedural default, this Court finds this claim to have no merit*. This Court ordered the parties to present testimony during these Rule 32 proceedings by deposition. After most of the depositions were taken, the State filed a motion 'to allow [M.A.M.] to testify at the Rule 32 evidentiary hearing on March 2, 1998.' *See* 'Motion to Allow Live Testimony of [M.A.M.].' As grounds for the motion, the State recited the following:

"'2. During the depositions of [J.P.], [J.D.], [S.L.], and [E.E.], counsel for Dobyne introduced some documents signed by [M.A.M.].

58

"'3. Additionally, counsel for Dobyne [has] mailed documents to the State for the purpose of stipulating to the documents' authenticity.  Among these documents are some of Dobyne's school records, some of which bear the signature of [M.A.M.].

"'4. The State proffers that M.A.M. will testify that, although she signed documents pertaining to Willie Dobyne, at the time of the trial, she had no recollection of him.  [M.A.M.] therefore could not have relied on extraneous information in arriving at her verdict in this case, as Dobyne contends in his Rule 32 amended petition.'

"*See* 'Motion to Allow Live Testimony of [M.A.M.],' filed February 20, 1998.

"This Court allowed the State to call [M.A.M.] as a witness at the evidentiary hearing.  The State showed [M.A.M.] every document she had signed regarding Willie Dobyne.  Upon her review of the documents, [M.A.M.] stated that they show the only personal contact she had with Dobyne was her administration of an IQ test on May 3, 1978, 14 years before she served on Dobyne's jury.  [M.A.M.] stated that her signature on the other documents concerning Dobyne was based on information she received from other school personnel and not from any personal contact with Dobyne.  Based on her testimony, the Court finds that [M.A.M.] did not withhold information during voir dire, but that, because of her minimal (almost nonexistent) contact with Dobyne, she had no personal knowledge regarding Dobyne.  Therefore, [M.A.M.] could not have relied on extraneous information in arriving at her verdict, as Dobyne alleges in his Rule 32 amended petition.  *Even if this claim was not procedurally defaulted, the Court would find that Dobyne's claims are lacking of merit.*"

C.R. at 2831-35.  (Emphasis added.)  Moreover, despite the statement by the Court of Criminal Appeals that a juror-misconduct claim can be

addressed only if it meets the requirements of a newly discovered material fact, imposed by Rule 32.1(e), Ala. R. Crim. P., that court also addressed Dobyne's claim on its merits.

The action taken by the trial court on Dobyne's Rule 32 petition distinguishes this case from the action taken on the petition filed in *Pierce*.  In this case, the trial court has already provided the relief that Dobyne would have received under *Pierce*.  In this case, both the trial court and the Court of Criminal Appeals directly addressed Dobyne's juror-misconduct claim.  The Court of Criminal Appeals applied the factors set out in *Tomlin v. State*, 695 So. 2d 157 (Ala. Crim. App. 1996), before concluding that the juror-misconduct claim was to be denied.  Thus, the situation presented in *Pierce* is not the situation presented in this case, and our holding in *Pierce* does not affect our determination that Dobyne's claim of juror misconduct was correctly addressed.

B.    *The Standard of Review Applicable to Juror-Misconduct Claims*

In addressing the Court of Criminal Appeals' ruling on Dobyne's juror-misconduct claim on the merits, we must note that that court employed the wrong standard when it stated:

> "To determine whether a defendant was prejudiced by a juror's failure to respond truthfully to a question during voir dire examination, the test is whether the defendant actually was prejudiced. *Knight v. State*, 710 So. 2d 511 (Ala. Cr. App. 1997). *See Dawson v. State*, 710 So. 2d 472 (Ala. 1997)."

*Dobyne*, 805 So. 2d at 759.

Although the Court of Criminal Appeals correctly held that, based on the evidence presented at the Rule 32 hearing, Dobyne is not entitled to relief from his conviction or his sentence, the standard the Court of Criminal Appeals applied in reaching its conclusion that this Court, in *Dawson*, had changed the law relating to the standard of proof required to prove a juror-misconduct claim, is not correct.  In *Dawson*, this Court

applied the same standard that was advanced in *Roan v. State*, 225 Ala. 428, 143 So. 454 (1932), namely, that in determining whether a new trial or a reversal is warranted because of juror misconduct (in this present case a juror's alleged failure to respond truthfully to a question during voir dire) the test is whether the defendant might have been prejudiced, not whether he actually was prejudiced, by such misconduct. *See Roan*, 225 Ala. at 435, 143 So. at 459. ("The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it *might have unlawfully influenced* . . . [the] verdict rendered." (Emphasis added.)); and *Dawson*, 710 So. 2d 472, 476 (Ala. 1997) ("Because Dawson failed to show that the juror's viewing of the crime scene resulted in the introduction of facts that *might have unlawfully influenced* the jury's verdict, a new trial is not warranted." (Emphasis added.)). In fact, in *Dawson* this Court looked to *Reed v. State*, 547 So. 2d 596 (Ala. 1989), in resolving the issue presented. Both *Dawson* and *Reed* applied the "might-have-been-prejudiced" standard, rather than the "actual-prejudice" standard.

The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court's precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. *See Ex parte Stewart*, 659 So. 2d 122 (Ala. 1993); *Campbell v. Williams*, 638 So. 2d 804 (Ala. 1994); *Union Mortgage Co. v. Barlow*, 595 So. 2d 1335 (Ala. 1992), *cert. denied*, 506 U.S. 906, 113 S. Ct. 301, 121 L. Ed. 2d 224 (1992). The "might-have-been-prejudiced" standard, of course, casts a "lighter" burden on the defendant than the actual-prejudice standard. *See Tomlin v. State, supra*, 695 So. 2d at 170. For a more recent detailed discussion of the burden of proof required to make a showing under the "might-have-been-prejudiced" standard, *see Ex parte Apicella*, [Ms. 1992273, March 30, 2001] — So.2d — at — (Ala. 2001) ("It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case." (Emphasis original.)).

It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their

peremptory strikes wisely. *See Fabianke v. Weaver*, 527 So. 2d 1253 (Ala. 1988). However, not every failure to respond properly to questions propounded during voir dire "automatically entitles [the defendant] to a new trial or reversal of the cause on appeal." *Freeman v. Hall*, 286 Ala. 161, 166, 238 So. 2d 330, 335 (1970); see also *Dawson v. State*, supra, at 474; and *Reed v. State, supra*. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is "whether the defendant might have been prejudiced by a veniremember's failure to make a proper response." *Ex parte Stewart*, 659 So. 2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion. *Eaton v. Horton*, 565 So. 2d 183 (Ala. 1990); *Land & Assocs., Inc. v. Simmons*, 562 So. 2d 140 (Ala. 1989) (Houston, J., concurring specially).

> "The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: 'temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'"

*Union Mortgage Co. v. Barlow*, 595 So. 2d at 1342-43 (*quoting Freeman v. Hall, supra* (other citations omitted)). The trial court, in its order denying Dobyne's Rule 32 petition, extensively addressed these factors in determining that juror M.A.M.'s failure to respond did not present a situation that might have been prejudicial to Dobyne. While Dobyne presented an affidavit of a juror, G.S., that stated that M.A.M. had improperly influenced the jury to consider her knowledge of mental retardation, rather than the evidence presented at trial, we have stated in other contexts that "[we] grant great deference to the trial judge, who is

on the scene and who can best judge the credibility of the participants and determine what actually occurred." *Ex parte Pressley*, 770 So. 2d 143, 147 (Ala. 2000).

The form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. *Ex parte Ledbetter*, 404 So. 2d 731 (Ala. 1981); *Warrick v. State*, 460 So. 2d 320 (Ala. Crim. App. 1984); and *Leach v. State*, 31 Ala. App. 390, 18 So. 2d 285 (1944). If the party establishes that the juror's disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. *Id.* Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in *Ledbetter, supra*, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in *State v. Freeman*, 605 So. 2d 1258 (Ala. Crim. App. 1992).

Dobyne is not entitled to relief on this juror-misconduct claim because he neither proffered nor introduced evidence that a true answer by M.A.M. would have caused him to challenge M.A.M. for cause or to exercise a peremptory challenge against her. The closest to direct evidence to such effect proffered or introduced in the trial court in support of this Rule 32 claim was this testimony by one of Dobyne's trial lawyers:

> "Q. You testified before about the foreperson of the jury, [M.A.M]. At the time of the trial, what did you know about [M.A.M.'s] relationship, if any, with Willie Dobyne?

> "A. I was not aware of any relationship that she had with Willie at the time of the trial.

> "Q. Did you know that-at that time, did you know that when she was involved in the schools when Willie was in school, that she had been involved in making a determination that

63

Willie's mental retardation or low intelligence had nothing to do with some misbehavior that he had engaged in?

"A.   No, I was not aware of that.

"Q.   If you had known that, is it possible that that would have had any effect on your thinking about her as a desirable juror?

"A.   Yes, sure, it's possible."

(R. 1429-30.)  An inference on an inference, forbidden by law, *Malone Freight Lines, Inc. v. McCardle*, 277 Ala. 100, 167 So. 2d 274 (1964), would be necessary to conclude from the answer "Yes, sure, it's possible," that the defense would have challenged M.A.M. (even successfully) for cause or would have exercised a peremptory challenge against her had she revealed the information.  The first inference needed by the defendant would be that the "effect on [his lawyer's] thinking about her as a desirable juror" would have been negative rather than positive, for trial counsel's other testimony reveals that they affirmatively thought M.A.M.'s training and experience made her a desirable juror.  The second inference, to be impermissibly inferred from the first inference, would be that the negative effect on the lawyer's thinking would have been strong enough to overcome his, and cocounsel's, favorable impression of M.A.M. as a juror and to impel them to challenge her for cause or to exercise a peremptory strike to remove her from the venire.  Thus, this testimony fails to establish the requisite prejudice.

In the Rule 32 proceedings, Dobyne also had introduced evidence that, over a span of years more than a decade before the trial, M.A.M., in her capacity as special education coordinator for the Bibb County school system, which included the schools Dobyne then attended, had participated in certain evaluations of his intelligence and behavior.  If M.A.M. had recalled and disclosed this information during voir dire, we would note that, even so, the nature of the information, together with the information the defense already knew at that time, does not, in and of

64

itself, tend to establish that it would have caused the defense to challenge M.A.M. to remove her, or to peremptorily strike her, from the venire.

Dobyne argues that the trial court erroneously deprived him of an opportunity to call witnesses to impeach M.A.M.'s live Rule 32 testimony to the effect that she did not recognize or recall Dobyne during the voir dire. In the Rule 32 proceedings, the trial court allowed the state to present M.A.M.'s testimony live. At the same hearing, Dobyne introduced the affidavits of several witnesses whose testimony does tend to impeach M.A.M. by tending to prove that M.A.M. must have recognized and recalled Dobyne during the voir dire when she failed to respond to the question "Is there anyone who knows the defendant, Willie Dobyne." Such impeachment tends to establish that a truthful answer by M.A.M. at voir dire would have revealed M.A.M.'s previous professional acquaintance and work with Dobyne. Absent any proffer of evidence indicating that such a revelation at voir dire would have caused the defense to challenge M.A.M., or to strike her, as already discussed, however, the trial judge's hearing live testimony from the impeaching affiants would have served no purpose. Therefore, the Court of Criminal Appeals did not err in rejecting the juror-misconduct claim.

*Ex Parte Dobyne*, 805 So. 2d 763, 767-74 (Ala. 2001) (emphasis and bracketed alterations in original) (footnote omitted).

    **1**.   *Amendments to habeas jurisprudence worked by the Antiterrorism and Effective Death Penalty Act of 1996*

The Antiterrorism and Effective Death Penalty Act of 1996 ("the Act" or "AEDPA"), which amended pre-existing habeas statutes, was signed into law by President Clinton on April 24, 1996. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). The present petition was filed after that date. Accordingly, the habeas statutes as

amended by AEDPA apply to the claims asserted in this case.  *See id.* § 107(c), 110 Stat. at 1226; *Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254).[81]

The Act "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).  The Act requires federal courts to give greater deference to state court determinations of federal constitutional claims than was accorded such decisions under previous law. *See*, *e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001).  For example, a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).  Moreover, when a state court fairly addresses the merits of a federal constitutional claim and adequately explains the basis for its decision, habeas relief cannot be granted unless it is determined that the state court's adjudication of the claim:

---

[81]*See also*, *e.g.*, *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same).  *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that ADEPA's amendments do not apply to habeas petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The statutory phrase "clearly established federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion); *see also*, *e.g.*, *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[82] A state-

---

[82]*See also Williams v. Taylor*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.") (emphasis supplied).

court determination can be "contrary to" clearly established Supreme Court precedent

in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the
> state court arrives at a conclusion opposite to that reached by this Court
> on a question of law.  *Second*, a state-court decision is also contrary to
> this Court's precedent if the state court confronts facts that are
> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied).  *See also*, *e.g.*, *Brown v. Payton*, 544

U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*)

(same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).  The

Eleventh Circuit has observed that the majority opinion in *Williams* does not limit the

construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth

above.  Instead, the statutory language "simply implies that 'the state court's decision

must be substantially different from the relevant precedent of [the Supreme] Court.'"

*Alderman v. Terry*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).[83]

---

[83]Indeed, as one commentator has observed, the possible permutations are not just two, but
at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency.  Two
> propositions are incompatible with one another if both cannot be true or correct.
> Thus, a state court decision is contrary to federal law if that decision and the
> applicable federal law cannot both be true or correct.  Given this premise, there
> appears to be four possible combinations of state court adjudications and resulting
> decisions that are pertinent to this textual inquiry:

> ● the state court applies the correct federal standard and arrives at a correct

On the other hand, a state-court determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied). *See also*, *e.g., Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable." *Williams*, 529 U.S.

---

outcome;

- the state court applies an incorrect federal standard and arrives at an incorrect outcome;

- the state court applies an incorrect federal standard and arrives at a correct outcome; and,

- the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

at 409 (emphasis added).[84]  In other words, the question that should be asked is *not*

whether the state court "correctly" applied Supreme Court precedent when deciding

the federal constitutional issue, but whether the state court's determination was

"reasonable," *even if incorrect.  See*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the

"focus" of the inquiry into the reasonableness of a state court's determination of a

federal constitutional issue "is on whether the state court's application of clearly

established federal law is objectively unreasonable," and, "an unreasonable

application is different from an incorrect one"); *Williams*, 529 U.S. at 411 (holding

that a federal habeas court "may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application

must also be unreasonable.").

　　　In addition to the companion provisions of § 2254(d)(1), subsection (d)(2)

---

[84]The Eleventh Circuit recently observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id*. (quoting *Williams v. Taylor*, 529 U.S. at 409).

regulates federal court review of state court findings of fact. That provision limits the availability of relief to decisions that were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *See also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

**2**.   *Application of AEDPA to the present claim*

With regard to the first aspect of Dobyne's juror misconduct claim — the contention that Mary Ann Moody was not truthful during voir dire — respondent first observes that Dobyne raised this claim in his Rule 32 petition, and the Alabama Supreme Court found the issue to be without merit in *Ex Parte Dobyne*, 805 So. 2d 763, 767-74 (Ala. 2001). Respondent then argues that Dobyne has not established that the state supreme court's adjudication of the issue is contrary to, or an unreasonable application of, clearly established federal law, or that the decision was based upon an unreasonable determination of the facts. Respondent is wrong.

The United States Supreme Court has "long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove

71

actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  Dobyne maintains that the one-sided hearing conducted by the Rule 32 trial court judge — during which only the State was allowed the opportunity to present testimony, and that from the very juror Dobyne accuses of misconduct — was an unreasonable application of *Smith v. Phillips*.[85]   Dobyne points out that, even though the Alabama Supreme Court observed that he had been allowed to present *some* evidence — but only in the form of affidavits — he was expressly refused permission to submit testimonial evidence in support of his claim; indeed, he was permitted only to submit proffers of proof, representations by counsel of the testimonial evidence that would have been presented, if Dobyne had been allowed the opportunity to do so.[86]

This court agrees that Dobyne was improperly denied his right to present evidence on the question of juror misconduct.  If the Rule 32 trial court had afforded Dobyne the opportunity to present live testimony contradicting that of Ms. Moody, the trial court judge would have been able to judge Ms. Moody's credibility, based upon all relevant evidence.  As it was, the judge merely accepted Ms. Moody's statements as true.  Therefore, the Alabama Supreme Court's adjudication of this

---

[85] *See* doc. no. 36 (*Petitioner's Brief in Support of Revised Amended Petition for Writ of Habeas Corpus*), at 13-14.

[86] *Id.* at 17 n.9.

issue was an unreasonable application of clearly established Federal law, as determined by the United States Supreme Court in *Smith v. Phillips*, *supra*. Accordingly, Dobyne is entitled to an evidentiary hearing on this aspect of his juror misconduct claim.

When addressing the second aspect of Dobyne's juror misconduct claim — the allegation that Ms. Moody was "a forceful advocate for the death penalty" during sentencing deliberations — the Alabama Supreme Court merely assumed that the Rule 32 trial court had considered the affidavit of juror Glenda Snelson in reaching the conclusion that Ms. Moody was not biased, and that she did not improperly influence other jurors during sentencing deliberations.  However, absolutely nothing in the state court record reflects that Ms. Snelson's affidavit was considered by the Rule 32 trial court; and neither she, nor the other juror witnesses Dobyne was prepared to call to the stand, was allowed to testify at the hearing.  The Rule 32 trial court's findings, therefore, were based on an improper exclusion of evidence proffered by Dobyne, and the Alabama Supreme Court's affirmance of those findings was based upon an unreasonable determination of the facts, in light of the evidence presented in the state court proceedings.  The gravity of these errors is only compounded when the circumstances are viewed in the retroactive light of *Atkins v. Virginia*, and the improper influence Mary Ann Moody may have had on other jurors

when addressing the question of Dobyne's mental retardation.  Accordingly, Dobyne is entitled to an evidentiary hearing on this issue.

An appropriate order, consistent with this memorandum opinion, will be entered contemporaneously herewith.  All other issues raised in Dobyne's final amended petition are held in abeyance, pending the conclusion of the evidentiary hearings on the issues addressed above.

DONE this 13th day of April, 2007.

_____
United States District Judge